**Applications of OKLAHOMA TURNPIKE AUTHORITY (three cases).**

**In re TURNPIKE REVENUE BONDS.**

Nos. 36723–36725.

Supreme Court of Oklahoma.

Dec. 7, 1954.

Mitchell & Pershing, New York City, Looney, Watts, Ross, Looney & Smith, Oklahoma City, Robinson, Shipp, Robertson & Barnes, Oklahoma City, Don Welch, Jr., James Hamill, Madill, for Oklahoma Turnpike Authority.

WELCH, Justice.

The applicant, Oklahoma Turnpike Authority, hereinafter referred to as the "Authority," made provision by proper resolutions for three bond issues of Turnpike Revenue Bonds for the construction of three toll turnpikes in Oklahoma; one bond issue for the "Northern Turnpike" in the sum of $63,000,000; one bond issue for the "Southwestern Turnpike" in the sum of $83,000,000, and one bond issue for the "Northeastern Turnpike" in the sum of $68,000,000. The purpose of these bond issues was to obtain funds to construct the "Northern Turnpike" from Oklahoma City, or from near the Oklahoma City terminus of the Turner Turnpike northward to the Kansas State line near Wichita, Kansas, and to construct the "Southwestern Turnpike" from a similar beginning point and extending southwestward to the Texas State line near Wichita Falls, Texas, and to construct the "Northeastern Turnpike" from Tulsa northeastward to the Missouri State line near Joplin, Missouri. The Authority has filed three applications in causes Nos. 36,723, 36,724 and 36,725. These applications seek the approval of the bond issues above mentioned respectively, and such cases and such applications have been consolidated for decision by order of the court. These applications were filed as original actions in this court pursuant to provisions of the Act above cited which authorizes the Authority to so proceed in its discretion. 69 O.S.1951 § 668. By that section exclusive original jurisdiction is conferred upon this court to hear and determine such applications, and the duty of the court in such an action is set out in the Act.

As provided and required by the last cited section "Notice of the hearing" on these applications was "given by a notice published in a newspaper of general circulation in the state" that on December 3, 1954, the Authority would "ask the court to hear its application and approve the bonds." Such notice, published for the time required, informed "all persons interested that they may file protests against the issuance of the bonds and be present at the hearing and contest the legality thereof."

At the appointed time, no one appeared to contest the legality of the bonds of either of the issues, nor was any protest filed against the issuance thereof in either cause.

Thereupon, this Court, as required by the last cited section, gave "such applications precedence over the other business of the court" and fully heard the three matters upon oral presentation, and upon written request to consider the specific questions posed in each case, with exhibits presented with the applications in each case which included, among others, the appropriate legislative acts, the certified results of the state-wide referendum election, the action of the Governor pursuant thereto in appointing members of the Oklahoma Turnpike Authority, various minutes of meetings of the Authority fixing the three toll turnpike routes and providing for the issuance of these bonds, showing the form of the bonds, and the trust agreements incident thereto.

The bond form is similar in each case, but since the three bond issues are separate, the bonds of the first issue above referred to are properly identified on their face as "Northern Turnpike" bonds, those of the second issue as "Southwestern Turnpike" bonds, and the bonds in the third case as "Northeastern Turnpike" bonds. The trust agreements in the three cases are quite similar, making it clear that the revenue of each of the three toll turnpikes is to pay and retire its own bond issue. By law of course the bonds create no debt against the State, and that is shown on the face of the bonds as the law requires. Section 1, House Bill 933, Session Laws of 1953, page 357, 69 O.S.Supp. § 652.

In determining the matter of the validity of these three bond issues, numerous questions are presented which we number and discuss consecutively for convenience and to meet the method of presentation:

First Question:

"Are those whom the Governor has appointed as members of The Oklahoma Turnpike Authority legally qualified to act as such members prior to the time when their appointments have been acted upon by the Senate of the State of Oklahoma?"

In answering the first question we must consider, and in part construe, the legislative act creating the present Oklahoma Turnpike Authority to determine the legislative intent on the point involved. The Act was first passed by the Legislature in 1953, and approved by the Governor. It was then referred to the people by appropriate procedure, and was approved at a state-wide referendum election on January 26, 1954, at which time it became fully effective.

We observe that section 2 of the Act, H.B. 933, S.L. 1953, p. 357; 69 O.S.Supp. § 653, provides in part as follows:

"There is hereby created a body corporate and politic to be known as the 'Oklahoma Turnpike Authority' * * *. The Authority is hereby constituted an instrumentality of the State, and the exercise by the Authority of the powers conferred by this Act, in the construction, operation, and maintenance of turnpike projects shall be deemed and held to be essential governmental function of the State. * * *

"The Oklahoma Turnpike Authority shall consist of one member from each congressional district of the State of Oklahoma and shall include the Governor of the State, who shall be a member ex-officio; all members to be appointed by the Governor, by and with consent of the Senate. * * * The members of the Authority first appointed shall continue in office for terms expiring on July 1, 1955; July 1, 1956; July 1, 1957; July 1, 1958; July 1, 1959 and July 1, 1960, respectively, the terms of each such member to be designated by the Governor, and until the respective successors shall be duly appointed and qualified. The successor of each such member shall be appointed for a term of eight (8) years, except that any person appointed to fill a vacancy shall be appointed to serve only for an unexpired term, and a member of the Authority shall be eligible for reappointment. Each appointed member of the Authority before entering upon his duties shall take an oath as provided

by Section 1 of Article XV of the Constitution of the State of Oklahoma. * * *

"The Authority created by this Act, *when the members thereof have been appointed and qualified, shall be* the legal successor to the Oklahoma Turnpike Authority created by Senate Bill No. 225 of the Twenty-first Legislature (69 O.S.1951, Section 653), *and shall assume* all powers, duties, obligations and responsibilities of said Authority, and is *hereby empowered to take charge immediately upon their appointment and qualification.*" (Emphasis added.)

█ This Court will take judicial knowledge of the dates and final adjournment of the Legislature. Lusk v. Ryan, 69 Okl. 165, 171 P. 323. The Twenty-fourth Legislature of Oklahoma (1953) adjourned June 6, 1953, more than seven months before the effective date of this Act, January 26, 1954. Neither the Legislature nor the Senate has been in Session since June, 1953. The Honorable Johnston Murray, Governor of Oklahoma, appointed the present members of the Oklahoma Turnpike Authority on January 30, 1954, fixing term expirations as provided in the Act; Mr. Kirk Woodliff for term ending July 1, 1955; Mr. Milt Phillips for term ending July 1, 1956; Mr. Joe R. Jarboe for term ending July 1, 1957; Mr. C. D. Payne for term ending July 1, 1958; Mr. Roy M. Johnson for term ending July 1, 1959, and Mr. Norman Hirschfield for term ending July 1, 1960; each qualified by proper oath and by making the required bond of $50,000 on February 3, 1954.

The answer to this first question reposes in the legislative intent as demonstrated in this Act. Was it intended that these men act as members of the Authority from and after their appointment and qualification? Or was it intended that they should not so act, and should not constitute the Turnpike Authority until they should be confirmed by action of the Senate?

We observe from the Act the following: (1) It was clearly intended that the members should be appointed when the Act should become effective; (2) The Act expressly provided that "The Authority created by this Act, when the members thereof have been appointed and qualified, shall be the legal successor to the Oklahoma Turnpike Authority created by Senate Bill No. 225 of the Twenty-first Legislature (69 O.S. 1951, Section 653), and shall assume all powers, duties, obligations and responsibilities of said Authority, and is hereby empowered to take charge immediately upon their appointment and qualification"; (3) Each of the respective terms of the members was made to expire in the month of July, a time when the Legislature is not normally in session, and a date either six months or a year and six months before the next session of the Legislature.

It seems incredible that it could have been intended that this entire membership should be appointed upon the effective date of this Act, which could have occurred in September, 1953 but for the referendum, yet that the Authority remain wholly dormant and inactive until the 1955 Session of the Legislature. It is equally beyond belief that it could have been intended that future appointments be made at term expirations, yet the appointees could not act for six months or for a year and six months, until subsequent Senate confirmation. The result of any such thought would be that in future years a full one-third of the membership from time to time would be barred from active participation for many months, and each year one or two of the members would be so incapacitated while idly waiting the next Senate Session.

We think the only logical conclusion to be reached, is that it was the definite legislative intent that these members of the Authority were or would be fully empowered to act from and after their appointment and their qualification by oath and bond. We conclude that was the expressed mandate of the Act.

A similar situation arose in Ohio when the 98th General Assembly in 1949 enacted a Turnpike Act and adjourned on July 29th. The Act became effective the following September 1st, providing for Senate confirmation of members. The Governor appointed the members on September 8,

1949, long before the next Senate Session. It was there held in State, ex rel. Allen v. Ferguson, 155 Ohio St. 26, 97 N.E.2d 660, that the appointments were fully effective from the date they were made. We believe our Act is more definite in that regard than the Ohio Act.

For the reasons stated, and upon the terms and provisions of the Act before us, we answer this first question in the affirmative.

Second Question:

"Is it lawful for the Authority to devote and use a portion of the proceeds of the bonds for each of these three projects for the payment of the costs of an administration building for the use of all of the turnpikes constructed and to be constructed within the State of Oklahoma?"

Subdivision (b) of Section 3 of the Act, 69 O.S.A. § 654, defines the word "project" or the words "turnpike project" to mean any express highway constructed under the provisions of this Act, "and shall embrace", among other things, "administration, storage and other buildings which the Authority may deem necessary for the operation of such turnpike". (Emphasis added.)

Subdivision (c) of the same section defines the word "cost" to include administration expense. Section 4 of said House Bill 933, 69 O.S.Supp. § 655, provides that the Authority is hereby authorized and empowered:

"* * * (c) To maintain an office at such place or places within the State as it may designate;

*. * * * * *

"(f) To issue turnpike revenue bonds of the Authority, payable solely from revenues, for the purpose of paying all or any part of the cost of any one or more turnpike projects.

"(g) To fix and revise from time to time tolls for the use of any turnpike projects; provided that the tolls when so fixed, plus revenues derived from other sources, shall, when applied to the estimated amount of traffic, produce sufficient revenue (a) to pay for the annual cost of the operation, maintenance, and repair of such project * * *."

Section 6 of said House Bill 933, 69 O.S.Supp. § 657 provides that the Authority is "authorized and empowered to acquire by purchase, or condemnation lands or such interest therein as in its discretion may be necessary for the purpose of establishing, constructing, maintaining and operating turnpike projects".

Section 10 of said House Bill 933, 69 O.S.Supp. § 672 provides that "This Act, being necessary for the welfare of the State and its inhabitants, shall be liberally construed to effect the purposes thereof".

It is clearly apparent that the operation of each of the projects must be staffed and administered. Each such project must either own or rent office quarters. The several projects will, or may be staffed and served by the same personnel. Their time, of necessity, must be allocated to the several projects. It would be an obvious waste of funds to require separate office quarters and complete separate personnel.

The general rule is that all legislative enactments must be interpreted in accordance with their plain ordinary meaning according to the import of the language used. See Loeffler v. Federal Supply Company, 187 Okl. 373, 102 P.2d 862.

A statute will not be so construed as to lead to an absurdity, and such construction should be avoided if it can be done without violence to the evident intent of the Legislature as expressed in the statute. See Talley v. Harris, 199 Okl. 47, 182 P.2d 765.

The statute seems to clearly authorize this use of a part of the bond proceeds. The purpose to so use such money is expressly carried forward into the trust agreement, which in effect is made a part of each bond issued, so that all concerned know of such expenditure and acquiesce therein. It is a legitimate expenditure, in connection with and incident to the construction and maintenance of the toll turnpike project, and would become an integral part of the project.

In so far as such a building would be used for the business of each of these three toll turnpikes it would indirectly contribute to the payment of the separate bond issue of each of the three, in that it would save the expenditure of funds of each turnpike for office space rentals; and if any building space constructed out of bond proceeds of these three bond issues should be used by or for the benefit of any other turnpike project, it would produce rent income to go into the respective funds of these three turnpike projects and would thereby directly contribute to the payment of these bonds.

There seems to be no reason why the State or any citizen could object or complain. Any such building together with the roadway and all the balance of the entire project would become the property of the State when the bonds issued against the project are fully paid.

■ Upon the authorities and for the reasons stated, we answer the second question in the affirmative.

Third Question:

"Do the maturities of the bonds to be issued under the provisions of Section 208 of the Trust Agreement, and any bonds that may be issued under Section 209 of the Trust Agreement violate the provisions of the statutes of the State of Oklahoma (Title 69, Oklahoma Statutes Annotated, Section 659) requiring the bonds to mature in annual installments?"

Section 208 of the trust agreement provides that the bonds to be issued shall be dated as of the first day of December, 1954, and shall be stated to mature, subject to the right of prior redemption, on the first day of December in the following years and in the following amounts respectively; (thereafter setting forth the year 1962 and each subsequent year to and including the year 1993).

Section 209 of the trust agreement provides that if, and to the extent necessary to provide additional funds for completing payment of the cost of the turnpike, turnpike revenue bonds may be issued under and secured by this agreement, at one time or from time to time, in addition to the bonds issued under the provisions of Section 208 of this Article. That they shall be dated as of the first day of December, 1954, and shall be stated to mature, subject to the right of prior redemption, on the first day of December, 1993.

Section 8 of said House Bill 933, 69 O.S.Supp. § 659 provides:

"The Authority is hereby authorized to provide by resolution, at one time or from time to time, for the issuance of Turnpike revenue bonds of the Authority for the purpose of paying all or any part of the cost of any one or more Turnpike projects, but each project shall be covered by a separate resolution and separate bond issue or issues. The principal of and the interest on said bonds shall be payable solely from the funds herein provided for such payment. The bonds of each issue shall be dated, shall bear interest at a rate not to exceed five per centum per annum, and shall mature in annual installments at such time or times not exceeding the maximum time permitted by the Constitution of the State of Oklahoma, but in any event not more than forty (40) years after their date as may be determined by the Authority. The Authority may cause the bonds or any installment thereof to be made redeemable before maturity at the option of the Authority, at such price or prices and under such terms and conditions as may be fixed by the Authority prior to the issuance of the bonds. The Authority shall determine the form of the bonds, including any interest coupons to be attached thereto, and shall fix the denomination or denominations of the bonds and the place or places of payment of principal and interest, which may be at any bank or trust company within or without the State."

Although the Act requires annual maturities, it does not require equal annual maturities, nor does it require any definite date as to the first maturity.

This is the identical act under which the Turner Turnpike bonds were issued. The trust agreement securing the Turner Turnpike bonds contained the same provisions as Section 208 of the present trust agreement. Those bonds were dated August 1, 1950. The first maturity was August 1, 1958. The amount of the maturities ranged from $180,000 due in 1958 to $4,370,000 due in 1990.

In the application to this court for the approval of the Turner Turnpike bonds, 203 Okl. 325, 221 P.2d 795, 806, this question was presented:

"Eighth Question: Do the maturities of the bonds violate the provisions of Section 9 of the act requiring the bonds to mature in annual installments, or the provisions of Section 25, Article X of the Constitution limiting the maturity of the bonds of the State to twenty-five years?"

In answering that question this court there said:

"The bonds here involved are, as to maturities, in accord with the provisions of Section 9 of the act, and are not such bonds as come within the provisions of Section 25, Article 10 of the Constitution. That provision applies to bonds of the State, which create state indebtedness, and such bonds must follow that constitutional provision as to maturities to coincide with the providing of public revenue for their payment. Therefore, and for the further reasons stated in determining preceding questions, we answer question number Eight in the negative."

See, also, Application of Oklahoma Planning & Resources Board, 201 Okl. 178, 203 P.2d 415, and Application of Board of Regents, for Oklahoma Agricultural and Mechanical Colleges, 196 Okl. 622, 167 P.2d 883, and see Armstrong v. Sewer Improvement District No. 1, 201 Okl. 531, 199 P.2d 1012, 207 P.2d 917.

Section 8 of the Act, 69 O.S.Supp. § 659 also provides in part:

"If the proceeds of the bonds of any issue, by error of estimates or other-wise, shall be less than such cost, additional bonds may in like manner be issued to provide the amount of such deficit, and, unless otherwise provided in the resolution authorizing the issuance of such bonds or in the trust agreement securing the same, shall be deemed to be of the same issue and shall be entitled to payment from the same fund without preference or priority of the bonds first issued."

The trust agreement securing the Turner Turnpike bonds carried the same provision as Section 209 of the present trust agreement relating to the issuance of additional bonds if additional funds were required for completing payment of the cost of that turnpike. An additional bond issue was required to complete the construction of the Turner Turnpike, and in the application of Oklahoma Turnpike Authority for the purpose of securing the approval of an additional $7,000,000 bond issue, 206 Okl. 617, 246 P.2d 327, 329, this court said:

"The law provides for additional bonds to be issued if need therefor arises in the construction of the project. 69 O.S.1951 § 659. In the proceedings for the initial bond issue for construction of this project it was provided that additional bonds might be issued if such need therefor should arise and such provision was set out in each of the 31,000 bonds initially issued and sold. As to this additional or supplementary bond issue there is a definite tie-in with the initial bond issue, so that the bonds of both issues will be paid, principal and interest, through the plan provided by the trust agreement executed in connection with the initial bond issue. That agreement provides in detail for the handling of all revenues from this toll road and for the payments therefrom of interest and principal of all bonds issued for construction of the project.

\* \* \* \* \* \*

"Second Question: 'Have the bonds been properly authorized in accordance with the act, and will the bonds when issued constitute valid obligations in accordance with their terms?'

"In this connection we observe that the act specifically authorizes issuance of bonds from time to time, thus contemplating that there would or might be additional or supplementary bond issues. From the showing made we observe that the proceedings in connection with the initial bond issue made provision for such additional or supplementary bond issue as we have above noted. We also observe from the showing made that the Authority by proper resolution provided for this additional or supplementary bond issue with full explanation of the reasons why the funds provided by the initial bond issue were not sufficient to complete the construction of the Turner Turnpike. It is therefore clear that this additional or supplementary bond issue of $7,000,000 has been properly authorized in accordance with the Act. These bonds when issued will have equal validity with the bonds initially issued in the sum of $31,000,-000, and these bonds when issued will constitute valid obligations in accord with their terms. We answer the second question in the affirmative."

■ Therefore upon the authorities, and for the reasons stated, we answer the third question here in the negative.

Fourth Question:

"Is the statutory requirement for annual maturities above referred to violated by the provisions of the Trust Agreement, (Section 211 in Cause No. 36,723 and 36,724, Sec. 210 in Cause No. 36,725) for the issuance of refunding bonds, if necessary, to avoid a default in the payment of any serial maturity, all of which refunding bonds will mature in 1993 (the last maturity of the bonds originally issued)?"

That section of each trust agreement provides:

"If at any time the Authority shall determine that the moneys in the special accounts hereinafter created in the Sinking Fund and designated 'Bond Service Account' and 'Reserve Account', over and above the amount re-quired for paying the interest which will become due and payable on the next succeeding interest payment date on all of the bonds then outstanding, will not be sufficient for paying all of the bonds which will mature within three (3) months thereafter, turnpike revenue refunding bonds may be issued under and secured by this Agreement for the purpose of refunding any part or all of such bonds. * * *"

There follows detailed provision as to the manner of issuing, authenticating, selling and delivering such refunding bonds, with provisions as to the handling and use of the proceeds of the refunding bonds to pay the former bonds to be refunded.

At first glance it might be argued that since the Authority is not presently issuing refunding bonds, or asking for the approval thereof, that this question is prematurely presented. However, it should be clearly noted that section is designed for, and placed in the trust agreement as, a safety valve to prevent a default in the earlier maturities in the event revenue declines to the point where a default may be anticipated. If such a condition occurs, the Authority may under the provisions of this section, and under the provisions of that section of the Act above quoted, issue refunding bonds for the bonds to be refunded, which refunding bonds shall be stated to mature on the first day of December, 1993, which, is of course, the date of maturity of the last bonds to be paid in all three of the presently proposed issues. In the event such refunding bonds are issued as to bonds of either of the separate bond issues here involved, such refunding bonds would become a part of the present issue to which they related and would be governed by the rules referred to in answering the third question, supra.

The issuance of turnpike revenue refunding bonds is expressly authorized by Section 9 of House Bill 933, 69 O.S.Supp. § 669, which provides as follows:

"The Authority is hereby authorized to provide by resolution for the issuance of turnpike revenue refunding bonds of the Authority for the purpose

of refunding any bonds then outstanding which shall have been issued under the provisions of this Act, including the payment of any redemption premium thereon and any interest accrued or to accrue to the date of redemption of such bonds. Each refunding issue shall be limited to the project in connection with which the bonds being refunded were issued and revenues pledged to pay any such refunding issue shall be limited to the revenue derived from said separate project. The issuance of such bonds, the maturities and other details thereof, the rights of the holders thereof, and the rights, duties and obligations of the Authority in respect of the same, shall be governed by the provisions of this Act in so far as the same may be applicable."

█ Therefore for the reasons stated here, and formerly stated in answering the third question, we answer this fourth question also in the negative.

The next two questions, specifically applicable to Cause No. 36,724 "Southwestern Turnpike" will be considered together.

Fifth Question:

"Is the above mentioned requirement for annual maturities violated by the provisions of the Trust Agreements (Section 210) for the issuance of additional bonds, if the estimated earnings will permit, for completing the construction of the remaining portion of the turnpike, all of which additional bonds will mature in 1994 (the year following the last maturity of the bonds originally issued)?"

Sixth Question:

"Does the Authority have power to issue bonds for acquiring the entire right-of-way and for constructing thereon at this time a major portion of the turnpike, the construction of the remaining portion at a later date being dependent upon earnings?"

Section 210 of the trust agreement in Cause No. 36,724 (with similar provisions in the other two cases) provides for what is commonly called an open-end trust indenture. Such provisions are commonly used where construction of a project is accomplished by separate stages of construction.

In the present case the Authority has determined from the estimates of the cost of construction and the estimates of revenues to be derived from the use of the turnpike that construction is presently feasible for that part of the "Southwestern Turnpike" between a connection with U. S. Route 77, immediately south of Oklahoma City, and the south bank of Red River (the Oklahoma State line). That the portion of said turnpike to be constructed at some later date from a connection with the Turner Turnpike near the Oklahoma City terminus and a point on U. S. Route 77 immediately south of Oklahoma City, runs through a populous section of Oklahoma City, across Southeast Twenty-ninth Street, a four-lane Highway to Tinker Field, over the South Canadian River, and over or under numerous wide roadways leading into and from Oklahoma City; that it is extremely expensive construction and cannot presently be financed from the traffic engineers' report of expected earnings. The Authority feels, however, that the traffic engineers' estimate of future earnings is ultra-conservative, and that a few years' experience, coupled with the expected growth of this portion of the State of Oklahoma, will reflect sufficient earnings to construct this presently omitted part of the said turnpike.

This method of construction clearly complies with the Turnpike Act. Section 4 of H.B. 933, 69 O.S.Supp. § 655, provides in part:

"The Authority is hereby authorized and empowered:

\*　　\*　　\*　　\*　　\*　　\*

"(e) To construct, maintain, repair and operate turnpike projects and highways, with their access and connecting roads, at such locations and on such routes as it shall determine to be feasible and economically sound; provided the Authority shall be authorized to construct and operate toll turnpikes only at the following locations: \*　\*　\*

"That part in Oklahoma of a turnpike between a connection with the Turner Turnpike near the Oklahoma City Terminus and Wichita Falls, Texas, or any part of such turnpike; * * *.

"(f) To issue turnpike revenue bonds of the Authority, payable solely from revenues, for the purpose of paying all or any part of the cost of any one or more turnpike projects".

Section 8 of H.B. 933, 69 O.S.Supp. § 659 provides in part as follows:

"The Authority is hereby authorized to provide by resolution, at one time or from time to time, for the issuance of Turnpike revenue bonds of the Authority for the purpose of paying all or any part of the cost of any one or more Turnpike projects * *.

"If the proceeds of the bonds of any issue, by error of estimates or otherwise, shall be less than such cost, additional bonds may in like manner be issued to provide the amount of such deficit * * *."

Section 10 of H.B. 933, 69 O.S.Supp. § 672 provides in part:

"This Act, being necessary for the welfare of the State and its inhabitants, shall be liberally construed to effect the purposes thereof; * * *."

It will be remembered that this Act by referendum petition was approved by the people at an election called for that purpose.

There can be no question logically raised as to the Authority's power to presently locate the terminus, or temporary terminus, at U.S. Route 77 South of Oklahoma City. There was a legal question in connection with the termini of the Turner Turnpike constructed some years ago, and in the Application of Oklahoma Turnpike Authority for the approval of the Turner Turnpike Bonds, 203 Okl. 335, 221 P.2d 795, 810, this court said:

"Twelfth Question: Is the plan of construction of the toll road a violation of the terms of the statutes and an illegal use of trust funds?

"Here we are not in any manner concerned with the details of construction of the road or any part thereof except the location of the ends thereof. The protestants point out that according to present plans the toll road will run from a point 'six miles from the business section of Tulsa' (offer of proof 9) to a point * * * about fifteen miles from the business district of Oklahoma * * * (protestants brief 49 A).

"The act in section 5, subdivision (e), 69 O.S.Supp. § 655(e), provides that the toll road '* * * shall extend between the cities of Tulsa and Oklahoma City * * *'. Protestants urged the construction plan as erroneous apparently on the contention that the toll road at each end thereof must extend to or into the city limits or into the business districts of Tulsa and Oklahoma City. We find no such plan of construction to be contemplated or required by the act. It would seem impractical to locate the termini of a much traveled toll road so as to empty travel thereon into the business district or into a thickly populated residential area of either of these two large cities. It would seem more workable to locate such termini near to, or at least some slight distance removed from the city limits of either city. It may be that this is common knowledge. At any rate, we assume it to be within the discretion of the proper authorities to so construct such a toll road and to so construct this toll road. It does not appear that this point presents the slightest abuse of discretion, and certainly it does not disclose any violation of the Turnpike Act and this twelfth question is answered in the negative."

In Guaranty Trust Company v. West Virginia Turnpike Commission, D.C., 109 F.Supp. 286, 295, the studies and estimates of the Commission resulted in a determination that a portion of the authorized turnpike could be financed by revenue bonds, but that because of the mountainous terrain to be encountered on the projected route and

the relatively light volume of traffic to be expected during the early years of operation, it would be impossible to finance a turnpike fully comprising four lanes of roadway. The Commission therefore proposed to build the turnpike in stages, a portion of the same to consist of a four-lane highway called Project "A," and a portion of the four-lane highway called Project "B,"eliminating from Project "A" the present construction of two lanes of the highway, as well as the center division; likewise omitting initially all but two lanes of the entire Project "B," reserving the right to later add the two lanes and center division omitted from the initial construction when revenues had increased to the extent that the later construction would be feasible from increased revenues. The West Virginia Turnpike Act quoted in the opinion is nearly identical with the Oklahoma Act. It provides that the Commission is authorized to issue revenue bonds at one time, or from time to time, payable solely from revenues for the purpose of paying all, or any part of the cost of any one or more turnpike projects. That Act, like the Oklahoma Act, was for the purpose of facilitating vehicular traffic in the state. It further provided that a liberal construction must be given to accomplish the purposes set forth in the Act. In its opinion in that case the court said:

"In accordance with well established principles of statutory construction, the language which is the subject of our study must be interpreted and construed so as to give effect, if possible, to every part of the Act. [Citing cases.] The interpretation must be in keeping with the purpose of the Act, as expressed in its title; [citing authorities] and a liberal construction must be given to the language to accomplish that purpose, as required by Section 20 of the Act."

And further said:

"In short, the Commission was authorized to construct, in the exercise of a sound discretion, whatever projects it might deem fit and proper in order to accomplish the purpose of the Act; that is, 'to facilitate vehicular traffic,' and to produce, as far as might be reasonably possible, the kind of turnpike envisioned in Section 1 of the Act.

"Even if I should be wrong in the foregoing reasoning; even if the Commission has no discretion under any circumstances to build a two-lane turnpike, with no provision for enlargement into multiple lanes; yet, it does not follow that the Commission has here acted beyond its powers. It has provided for a four-lane turnpike. It has decided that such a project cannot be financed at once; but it has further concluded, from the best expert advice obtainable, that it can be financed in stages. Therefore, it has determined to embark upon a project which, while consisting at first of only two lanes, is to evolve by stages into a four-lane turnpike.

\* \* \* \* \* \*

"Naturally, the final result of building by stages can never be predicted with absolute certainty. Economic changes; unforeseen engineering difficulties; international crises; these and many other contingencies may conceivably prevent entirely or postpone indefinitely the accomplishment of plans whose fulfillment at first appears definite and certain. 'The best-laid schemes o' mice an' men gang aft agley.' If certainty of fulfillment of a plan to build in stages a four-lane highway be required by the Act, it can be no more than a reasonable certainty. The exhibits filed with the pleadings demonstrate with reasonable certainty that the building and financing of the turnpike in the projected stages will result in a four-lane highway being finished and in use within a few years, the maximum period of transformation being estimated to be fifteen years. They demonstrate with like certainty that unless construction and financing by stages is undertaken, no four-lane turnpike can be built at all.

"The Legislature intended that turnpikes should be built. The Commission has determined to carry out this intention by the only means available

to it. I am of opinion that its plan conforms even to the strict interpretation of the Act expressed in the Attorney General's opinion.

"The Act itself contemplates the construction of turnpikes in stages. It provides that bonds may be authorized and issued at one time or from time to time for the payment of any part of the cost of any project. Obviously, no part of a project can be built at any one time which has not then been financed. The only money that can be used is that which is raised by revenue bonds issued and sold for that part of the project. It is equally obvious that there could be no market for a bond issue to raise funds for the construction of part of a project unless that part is to be put into use as soon as completed. Tolls are the only source of revenue with which to pay the bonds. The clear intention of the Legislature, as gathered from the entire Act, is that the Commission be empowered to proceed as it has proceeded."

In Application of Love, Sup., 133 N.Y.S. 2d 86, 89, it was contended that since the Authority had not constructed the entire project authorized, that it could not collect tolls upon that part of the project that had been constructed. In denying the application that court said:

"In my opinion, the view just expressed is fortified not only by the fact that no improvement and no bond issue under the provisions of Section 153-b is 'mandatory' but also by the fact that there is no limitation as to the time within which any particular part of the work is to be undertaken. When we consider the character and extent of the improvements authorized, both physical and in terms of millions of dollars, practical necessities and logic and reason confirm the view that the Legislature intended to clothe the Jones Beach State Parkway Authority with the power and authority to exercise judgment and discretion not only as to carrying out the physical improvement program, but also as to all details of the toll charge provided for financing the very extensive improvement program, including the time for putting the charge into effect.

"The widening and improvement of a very substantial part of the parkway, five miles, in fact, has been completed. The collection of tolls for the use of this substantial portion of the parkway is not only a reasonable exercise of the function of the Authority (whether such function be labelled ministerial, or legislative, or administrative) but it is also in the interests of the people of the State of New York. Of course, if no improvement had yet been made or if the work completed was trivial or negligible, the collection of any tolls at this time could be deemed to be so arbitrary and evidence of such bad faith, as to amount to a fraud upon the public and an illegal exercise of the Authority's function. Obviously, no such situation exists. On the contrary, the failure to commence collecting tolls at this time, in the situation which does exist, might well be deemed a failure on the part of respondents to exercise their functions (legislative, ministerial or administrative, whichever they may be termed) in accordance with sound judgment and reasonably prudent discretion."

 Upon these authorities, and for the reasons stated, we answer this fifth question in the negative, and this sixth question in the affirmative.

Seventh Question: (Specifically applicable to the "Northern Turnpike" Cause No. 36,723)

"Does the Authority have power to issue bonds for acquiring the entire right of way for construction thereon at this time four traffic lanes with center division for a major portion of the turnpike and two traffic lanes for the remaining portion, the construction of the additional two lanes for the remaining portion being dependent upon earnings?"

The trust agreement for the construction of that part in Oklahoma of a turnpike between the Oklahoma City terminus of the Turner Turnpike and Wichita, Kansas, the Northern Turnpike provides for the issuance of turnpike revenue bonds to finance the acquisition of the entire right of way and for the construction thereon at this time of four traffic lanes with center division for a major portion of the turnpike and two traffic lanes for an intermediate portion. The trust agreement further provides for the issuance of additional bonds to complete the construction of the turnpike at such times as the earnings of the turnpike warrant.

The extent to which the Authority can finance the construction of this turnpike at this time is dependent upon the estimates of revenues to be produced by the turnpike which in turn determines the amount of bonds that can be marketed. On the basis of reports of estimated traffic and earnings and construction cost of the turnpike project prepared for the Authority by its traffic and consulting engineers, the Authority determined that the portions of the turnpike project which it has authorized to be undertaken at this time is the maximum portion that can now be financed.

The financing of a part of a turnpike project, including acquisition of rights of way, is expressly authorized by the Turnpike Act. Section 8 of House Bill 933, 69 O.S.Supp. § 659, authorizes the Authority to provide for the issuance of turnpike revenue bonds "at one time or from time to time" for the purpose of paying "all or any part of the cost of any one or more Turnpike projects". Subdivision (b) of Section 3 of H.B. 933, 69 O.S.Supp. § 654 in defining the words "Turnpike project" includes "all property, rights, easements and interests which may be acquired by the Authority for the construction or the operation of such turnpike". Subdivision (c) of said section, in defining the word "costs" includes "the cost of the acquisition of all land, rights of way, property rights, easements, and interests acquired by the Authority".

This clear grant of authority is not in any way modified by 69 O.S.1951 § 651,

which is simply a general statement of the purposes of the Act. Statutory provisions, which are almost identical to those contained in the Turnpike Act at bar, were construed by the U. S. District Court for the Southern District of West Virginia in Guaranty Trust Company v. West Virginia Turnpike Commission, 109 F.Supp. 286, 297, in which it was alleged that the provision in that act corresponding with the provision contained in the Oklahoma Statute constituted a minimum standard of construction and prohibited the construction of a turnpike in stages. The court, in passing upon the question stated:

"The Act itself contemplates the construction of turnpikes in stages. It provides that bonds may be authorized and issued at one time or from time to time for the payment of any part of the cost of any project. Obviously, no part of a project can be built at any one time which has not then been financed. The only money that can be used is that which is raised by revenue bonds issued and sold for that part of the project. * * * The clear intention of the Legislature, as gathered from the entire Act, is that the Commission be empowered to proceed as it has proceeded."

This seventh question really deals with the method of laying or constructing the paved roadway of this project and has but little place or part in the over-all question of the validity of the proposed bond issue. The power of the Authority to issue bonds for acquisition of a right of way for construction thereon of four traffic lanes with center division is well settled by authorities heretofore cited in this opinion. If the toll turnpike is opened for traffic while some intermediate portion thereof is only completed to the extent of two traffic lanes, that of course could have no effect at all on the validity of the bonds. Surely it can make no difference if the original idea or plan or purpose is to leave the third and fourth traffic lanes in an intermediate section of the project to be fully paved later when the traffic justifies it. That is but little if anything more than a detail of pav-

ing or constructing, and a detail of money expenditure in construction, and all such details are wholly within the power of the Authority, subject in various instances to approval of the consulting engineers as specified in the trust agreement. Upon the authorities, and for the reasons set out, we answer this seventh question in the affirmative.

Eighth Question: (Specifically applicable to the "Southwestern Turnpike" Cause No. 36,724)

"Does the Authority have power to acquire, either by purchase or condemnation, the right-of-way for the remaining portion of the Southwestern Turnpike (from the Northern Terminus of the Initial Project at U. S. Route 77 to the Northern Terminus of the Turnpike at or near the Oklahoma City terminus of the Turner Turnpike) prior to the time when funds are available to the Authority for the construction of such remaining portion?"

Section 4 of H.B. 933, 69 O.S.Supp. § 655 provides in part:

"The Authority is hereby authorized and empowered:

\* \* \* \* \* \*

"(h) To acquire, hold, and dispose of real and personal property in the exercise of its powers and the performance of its duties under this Act;

"(i) To acquire in the name of the Authority by purchase or otherwise, on such terms and conditions and in such manner as it may deem proper, or by the exercise of the right of condemnation in manner hereinafter provided, such public or private lands, \* \* \* and interests, as it may deem necessary for carrying out the provisions of this Act \* \* \*.

"(k) To make and enter into all contracts and agreements necessary or incidental to the performance of its duties and the execution of its powers under this Act, \* \* \*.

"(n) To do all things necessary or convenient to carry out the powers expressly granted in this Act \* \* \*."

Section 6 of H.B. 933, 69 O.S.Supp. § 657 provides in part:

"The Authority is hereby authorized and empowered to acquire by purchase, or condemnation lands or such interest therein as in its discretion may be necessary for the purpose of establishing, constructing, maintaining and operating turnpike projects or relocation thereof, and facilities necessary and incident thereto, \* \* \* upon such terms and at such price as may be considered by it to be reasonable \* \* \*."

Section 7 of H.B. 933, 699 O.S.Supp. § 658, provides for the manner of use of the power of eminent domain.

Under the laws of Oklahoma, as interpreted by this court, the necessity of using property for public use is a legislative one. This includes not only properties required for present use, but properties that are required for prospective necessities.

In 18 Am.Jur. 736, Sec. 109, it is said:

"The grantee of the power of eminent domain may ordinarily exercise a large discretion not only in respect of the particular property, but also as to the amount of land to be taken for the public purpose. This discretion is not reviewable by the courts, unless, possibly, where there has been a gross abuse or manifest fraud. Ordinarily, agents in charge of the use may appropriate whatever amount of land is reasonably necessary for the public use. \* \* \*"

In 18 Am.Jur. 738m Sec. 111, it is said:

"In determination of whether the taking of property is necessary for public use, not only present demands of the public, but those which may be fairly anticipated in the future, may be considered. It is unquestionably within the power of a state or of a municipal corporation, when laying out a highway, to anticipate a growth in the population and a corresponding increase in public travel, and to take a wider strip of land than present necessities require and to cause only a

portion of the located way to be completed for travel. Similarly, the amount of land to be taken for street widening purposes is, to a large extent, within the discretion of the condemnor. It is not necessary for condemnation commissioners to limit the amount of land to be condemned for railway purposes to the actual acreage required for present needs. In the exercise of their discretion they can look to the future and to the gradually expanding need for switchyards, sidings, workshops, etc., and condemn such amount as seems reasonable to them. * * *"

In State ex rel. Hunter v. Superior Court for Snohomish County, 34 Wash.2d 214, 208 P.2d 866, 868, said:

"The statutes do not limit the amount of property that may be acquired by eminent domain, and therefore reasonable necessity considering present as well as probable future needs was the standard by which the commissioners were guided. This, of course, does not mean that the commissioners are permitted to speculate as to the possible needs at some remote future time. The proper limitation is the orbit of reasonable anticipation of future needs. These principles are recognized in State ex rel. Patterson v. Superior Court, 102 Wash. 331, 173 P. 186; Port of Everett v. Everett Improvement Co., 124 Wash. 486, 214 P. 1064. See also 18 Am.Jur. 736, 738, Eminent Domain, §§ 109 and 111; 29 C.J.S., Eminent Domain, § 92, page 888."

In Martin v. Portland Pipe Line Co., 158 F.2d 848, 850, the Circuit Court of Appeals for the First Circuit said:

"Finally it should be said that the number of lines of pipe that were needed to carry oil to Montreal was a detail that lay in the discretion of the petitioner to decide. Donees of the power of eminent domain are allowed considerable discretion with respect to details, e. g., determination of what property is necessary in the exercise of the grant. It seems obvious that determination as to the number of pipes to be laid pursuant to the easement granted in the present case was a detail to be determined by the appellee and should not be disturbed in the absence of fraud or bad faith. 18 Am.Jur., Eminent Domain, Section 108. It would be thoroughly impractical and inappropriate for the government to determine this detail, especially where the power of eminent domain was granted to a private corporation which had already started construction of a pipe line system and, in all probability, with an eye to future needs (18 Am.Jur., Eminent Domain, Section 111), had determined from an engineering standpoint the requirements of the contemplated system."

To the same effect is the very recent decision of the Supreme Court of Wisconsin in David Jeffrey Co. v. City of Milwaukee, 267 Wis. 559, 66 N.W.2d 362.

■ Therefore, we answer the eighth question in the affirmative.

Ninth Question: (Specifically applicable to the "Southwestern Turnpike" Cause No. 36,724)

This question in two subdivisions is presented after a preliminary statement as follows:

"The enabling act authorizes the construction of that part in Oklahoma of a turnpike between a connection with the Turner Turnpike near the Oklahoma City terminus and Wichita Falls, Texas, or any part thereof. It is expected that the Authority and the State Highway Commission of Texas will agree that they will jointly construct and maintain an adequate four lane toll free bridge across the Red River connecting with the southern terminus of the Turnpike, each paying one-half of the cost of such construction and maintenance, that the Texas Commission will construct and maintain an adequate four lane toll free divided highway from Wichita Falls, Texas, to said bridge, and in considera-

tion of the foregoing, the Authority will permit toll free passage over that portion to the turnpike between said bridge and the interchange at Randlett, Oklahoma, and the road connecting said interchange with U. S. Routes 277 and 281, to motor vehicles travelling between points in the State of Texas and points on said Routes 277 and 281.

"Does the Authority have the power to enter into such agreement which involves:

"(1) The payment from the proceeds of turnpike revenue bonds of one-half of the cost of a free bridge over a river which is the boundary between the two states; and

"(2) Free vehicular passage to some vehicles over a small portion of the turnpike?"

It would certainly be absurd to say that the Turnpike Authority is authorized under the Act to construct a turnpike from Oklahoma City to the north bank of Red River and stop at that point. There would be no place for vehicles to go. No way to cross the river, and consequently the effectiveness of the turnpike would be destroyed. The Turnpike Authority is specifically authorized to build access roads for the use of traffic in reaching and using the turnpike. The Red River bridge and the approach thereto from Randlett, Oklahoma, in effect is an access road. Access roads must of necessity be constructed at the ends of the turnpike and connecting to each interchange of the turnpike. The Act expressly extends to the Authority the power to build and maintain access roads.

Title 69 O.S.1951 § 651, Oklahoma Statutes Annotated provides:

"In order to facilitate vehicular traffic throughout the State and remove the present handicaps and hazards on the congested highways in the State, and to provide for the construction of modern express highways embodying every known safety device including center division, ample shoulder widths, long sight distances, the by-passing of cities and towns, multiple lanes in each direction, and grade separations at all intersections with other highways and railroads, the Oklahoma Turnpike Authority (hereinafter created) is hereby authorized and empowered to construct, maintain, repair, and operate turnpike projects (as hereinafter defined) at such locations as shall be approved by the State Highway Commission, and to issue turnpike revenue bonds of the Authority payable solely from revenues, to pay the cost of such projects."

Section 3 of H.B. 933, 69 O.S.Supp. 654 defines the word "project" or the words "turnpike project" as "any express highway, super highway, or motorway constructed under the provisions of this Act by the Authority, and shall embrace all bridges, tunnels, overpasses, underpasses, interchanges, entrance plazas, approaches, free access roads, bridges * * *."

Section 4 of H.B. 933, 69 O.S.Supp. § 655 provides in part:

"The Authority is hereby authorized and empowered:

. * * * * * *

"(e) To construct, maintain, repair and operate turnpike projects and highways, with their access and connecting roads, at such locations and on such routes as it shall determine to be feasible and economically sound; * * *."

and in section 4 of H.B. 933 as amended by Senate Bill 454 S.L.1953, page 270, 69 O.S.Supp. § 655(e) (5), it is provided:

"(5) All access roads connecting such turnpikes with existing highways must be built by funds furnished by the Turnpike Authority."

And it is provided in the same numbered subdivision:

"Said Authority is hereby authorized to enter into contracts or agreement with turnpike officials of other states for construction, maintenance and operation of interstate turnpikes."

In the same section it is provided:

"(j) To designate, except as is provided for herein, the locations, and

establish, limit and control such points of ingress to and egress from each Turnpike project as may be necessary or desirable in the judgment of the Authority to insure the proper operation and maintenance of such project, and to prohibit entrance to such project from any point or points not so designated".

In the same section it is provided:

"(k) To make and enter into all contracts and agreements necessary or incidental to the performance of its duties and the execution of its powers under this Act, * * *."

And in the same section the Authority is further authorized:

"(l) * * * and to receive and accept aid or contributions from any source of either money, property, labor, or other things of value, to be held, used, and applied only for the purposes for which such grants and contributions may be made".

The same section further authorizes the Authority:

"(n) To do all things necessary or convenient to carry out the powers expressly granted in this Act, * * *."

Section 10 of H.B. 933, 69 O.S.Supp. § 672 provides:

"This Act, being necessary for the welfare of the State and its inhabitants, shall be liberally construed to effect the purposes thereof; * * *."

And in the same section, after requiring the construction of certain interchanges and access roads, it is provided:

"All such access roads must be built entirely by funds furnished by the Turnpike Authority."

The plans for the construction of the Turner Turnpike provided for access roads at each end thereof. It further provided for access roads at each interchange. Those bonds were approved by this court in Application of the Oklahoma Turnpike Authority, 203 Okl. 335, 221 P.2d 795.

The question of the construction of access roads was presented to the Supreme Court of Indiana in Ennis v. State Highway Commission, 231 Ind. 311, 108 N.E.2d 687, 695. Upon that question the Supreme Court of Indiana said:

"It is also contended that no standard is provided for points of ingress and egress on the toll road projects. The act provides that points of ingress and egress shall be established, located, controlled, and limited as necessary and desirable, in the judgment of the commission and the chairman of the State Highway Commission, to insure the proper operation of the projects, and prohibit entrance at points not designated. * * * These are reasonable standards."

It seems clear the Authority does have the power here inquired about and we answer this ninth question in the affirmative.

Tenth Question:

"Are the provisions of the statutes of the State of Oklahoma which authorize the construction and operation of the part in Oklahoma of a turnpike between Tulsa, Oklahoma, and Joplin, Missouri, or any part of such Turnpike, violated by locating the southwest terminus approximately twelve miles east of the business district of the City of Tulsa?"

We conclude that our decision in answering question number twelve in Turner Turnpike, 203 Okl. 325, 221 P.2d 795, and our decision and discussion in this case in connection with the sixth question, supra, determine this point. We therefore answer this tenth question in the negative.

Eleventh Question:

"Do the proceedings heretofore taken by the Authority in connection with the issuance of the above mentioned bonds of all three bond issues comply with the provisions of the statutes of the State of Oklahoma authorizing the issuance of said bonds (Title 69, Sections 651–674 inclusive Oklahoma Statutes Annotated)?"

A complete transcript of the proceedings had by the Oklahoma Turnpike Authority

as to each proposed separate bond issue is attached to the respective applications. The transcripts in all three cases clearly reflect that the Authority performed each and every step as by law required. The members of the Authority were properly appointed by the Governor from the respective Congressional Districts of the State of Oklahoma. They took their oaths of office and filed the same in the office of the Secretary of State. They each executed a surety bond with sureties authorized to do business in the State of Oklahoma in the amounts fixed by the Act. They adopted by-laws for their own government and activities. They adopted a common seal. They properly located and designated the three toll turnpike projects as (1) "that part in Oklahoma of a turnpike between a connection with the Turner Turnpike near the Oklahoma City terminus and Wichita, Kansas," referred to as the "Northern Turnpike," and (2) "that part in Oklahoma of a turnpike between a connection with the Turner Turnpike near the Oklahoma City terminus and Wichita Falls, Texas, referred to as the "Southwestern Turnpike," and (3) "that part in Oklahoma of a turnpike between Tulsa, Oklahoma, and Joplin, Missouri, referred to as the "Northeastern Turnpike." These three designations and locations were approved by resolutions of the State Highway Commission as required by the Act. The Authority adopted three separate resolutions determining that these three projects are feasible after receiving detailed engineering reports as to the estimated cost of each of the projects, and after receiving reports of recognized traffic engineers as to the revenues to be expected from the operation of each of the three projects. The Authority properly selected a qualified trustee and approved and entered into a trust agreement to secure the bonds of each of the three proposed bond issues. The bonds will be sold and delivered at an interest rate less than the maximum fixed by the Act upon approval by this court of the bonds to be issued.

The proceeds had by the Oklahoma Turnpike Authority for the issuance of the bonds of all three proposed bond issues and the sales thereof are in exact accordance with the proceedings had in the sale of the bonds for the construction of the Turner Turnpike except that the present Act does not provide for an advertisement of the sale of the bonds and a sale thereof upon competitive bidding.

Section 8 of H.B. 933, 69 O.S.Supp. § 659, Oklahoma Annotated Statutes now provides:

"* * * The Authority may sell such bonds in such manner, either at public or private sale, and for such price as it may determine to be for the best interest of the State, but no such sale shall be made at a price so low as to require the payment of interest on the money received therefor at more than five (5%) percentum per annum computed with relation to the absolute maturity of the bonds in accordance with the standard tables of bond values * * *."

It is quite apparent that the Authority has carefully proceeded in the manner provided by law and within the powers granted by law, and for the reasons stated, this eleventh question is answered in the affirmative.

And having fully heard this matter, and having duly considered all questions raised, the court finds that the Oklahoma Turnpike Authority was legally created with valid delegation of power to carry out and perform its duties, including the issuance and sale of bonds to be retired out of proceeds of the operation of toll roads, and that in all things the three proposed bond issues were legally and properly authorized; and it is found and held that legal and valid notice of all three of these applications was given, and the court adjudges that it is satisfied that all of the Turnpike Revenue Bonds here involved have been properly authorized in accordance with the Act above cited, and that when issued the aforesaid bonds of Oklahoma Turnpike Authority as to all three bond issues here considered will constitute valid obligations in accordance with their terms, and therefore the court, by this opin-

ion, approves all three proposed issues of these bonds, as it is authorized to do by the Act above cited.

The court hereby fixes a period of three days within which a petition for rehearing may be filed herein.

HALLEY, C. J., JOHNSON, V. C. J., and CORN, DAVISON, ARNOLD, O'NEAL and WILLIAMS, JJ., concur.