In the Matter of APPLICATION OF OKLAHOMA TURNPIKE AUTHORITY for a Determination of the Validity of the Trust Fund and the Earmarking of Revenues Thereto, the Validity of a Pledge Thereof By the Authority As Provided In Enrolled House Bill No. 932 of the 1959 Session of the Oklahoma Legislature and for a Determination As To the Constitutionality and Validity of Said Act And The Provisions Thereof.

No. 38845.

Supreme Court of Oklahoma.

Jan. 8, 1960.

512

Norman E. Reynolds, Oklahoma City, Robert L. Wheeler, Tulsa, Leon Shipp, Looney, Watts, Looney & Nichols, Oklahoma City, for the Turnpike Authority.

Leroy Powers, Oklahoma City, Hardin Ballard, Purcell, for protestant.

WELCH, Justice.

The Oklahoma Turnpike Act of 1959, enrolled House Bill 932, of the 1959 Legislature, became effective on the 16th day of July, 1959.

It was provided in the second paragraph of section 5 of the Act, 69 O.S. Supp. § 668, that:

"Immediately upon the passage and approval of this Act, the Oklahoma Turnpike Authority shall file an application with the Supreme Court, under the procedure set out above, for a determination of the validity of such Trust Fund and the earmarking of revenues thereto, the validity of a pledge thereof by the Authority as provided in this Act, and any other questions as to the constitutionality or validity of this Act that may be brought before the Supreme Court, and exclusive, original jurisdiction is hereby conferred upon the Supreme Court to hear and determine such application. * * *"

The "procedure set out above" relates to the giving and publishing of notice, advising of the unrestricted right of protest, fixing the time allowed therefor and naming the hearing date. This detail was set out in the first paragraph of section 5 and need not be copied herein.

The Legislature had authority to confer this additional jurisdiction on the Supreme Court by reason of the provisions of the Constitution of Oklahoma, Article 7, Section 2, which generally states the original jurisdiction of the Supreme Court and provides that the Supreme Court may exercise such other and further jurisdiction as may be conferred upon it by law.

Pursuant to the above quoted provision, the applicant, Authority, filed this application for the determinations stated. Due notice was given. Protest was filed by Perry J. Baker and hearing was had at which both Authority and protestant appeared and participated by counsel.

This 1959 Act generally followed Turnpike legislation which has been passed upon and construed by this court in several cases: Application of the Oklahoma Turnpike Authority for the Approval of Bonds, 1950, 203 Okl. 335, 221 P.2d 795; Appli-

cation of Oklahoma Turnpike Authority for Approval of Bonds, 1952, 206 Okl. 617, 246 P.2d 327, and Application of Oklahoma Turnpike Authority for Approval of Bonds, Okl.1954, 277 P.2d 176.

Many of the questions which might ordinarily arise as to the construction and maintenance and financing of turnpike construction have been answered in these former decisions, and under those decisions turnpikes have been constructed and in operation for a number of years. However, this 1959 Act contains some other or new provisions as to financing, construction and operation of turnpikes. While this 1959 Act is based upon the same general plan and purpose to finance and build additional turnpikes, the new or additional details of plan present specific questions to be here determined.

 Upon the application of Authority, and the contentions of protestants, the several questions here presented for consideration and determination are numbered and treated consecutively for convenience and to meet the method of presentation.

First Question:

"May the Legislature apportion that portion of the tax collected from motor fuel consumed on the several Turnpikes in the State of Oklahoma to a Trust Fund to be used as a guarantee for the payment of interest upon Turnpike Bonds hereafter issued for the construction of additional Turnpikes as authorized by the Legislature or a vote of the people?"

In former Turnpike legislation all money collected as tolls for travel upon the Turnpike was placed in a general Turnpike Trust Fund to be used to pay for construction and maintenance of the Turnpike. This 1959 Act would create a separate segregated trust fund to be created by and contributed to by allocation of a stated portion of the motor fuel tax collected on motor fuel consumed on all Oklahoma Turnpike Projects, with limitation on the aggregate amount of such allocations, and with contingent provisions for the use of this fund

by Authority, and with provisions for repayment to this fund of any money so withdrawn therefrom by Authority.

That is accomplished by sections 1, 3 and 4 of the 1959 Act. Section 1 of the Act, 69 O.S.Supp.1959 § 680, is here quoted in full:

"(a) Beginning with the first apportionment of motor fuel taxes made after the passage and approval of this Act, and until all turnpike revenue bonds hereafter issued by the Oklahoma Turnpike Authority and the interest thereon shall have been paid, or a sufficient amount for the payment of all such bonds and the interest thereon shall have been set aside in trust for such purpose, the Oklahoma Tax Commission shall each month determine an amount equal to the motor fuel excise taxes computed on ninety-seven and one-half per cent (97½%) of the total gallonage of all fuels consumed, during the calendar month in which the tax being apportioned accrued, on all Oklahoma Turnpike Projects and apportion a sum equal to said amount from all gasoline tax collections as follows:

"Ninety-seven per cent (97%) of such amount to the Oklahoma Turnpike Authority and three per cent (3%) to the Oklahoma Tax Commission Fund, after which apportionment all other apportionments of motor fuel excise taxes shall be made according to existing or subsequently enacted apportionment laws. Provided that apportionments herein required to be made to the Oklahoma Turnpike Authority shall not in any fiscal year exceed One Million Dollars ($1,000,000.-00), and shall be deducted exclusively from those funds which would otherwise be apportioned to the State Highway Department or Commission for expenditure on State Highways, without affecting the amounts presently apportioned to the various cities and towns, counties, or for county roads.

"(b) If at the time of each monthly apportionment required herein there shall be a balance in the Trust Fund created by this Act equal to three (3) years annual interest on all Turnpike bonds on all turnpikes hereafter financed, or prior to the issuance of any such bonds there shall be a balance in the Trust Fund created by this Act in excess of Four Million Dollars ($4,000,000.00), the Oklahoma Tax Commission shall in said month make no apportionment to the Oklahoma Turnpike Authority of motor fuel taxes but shall apportion the same according to previously existing or subsequently enacted apportionment laws."

When a motor vehicle travels over the turnpike, the Authority and every one else observes the complete propriety and legality of collecting a toll to apply to pay for the Turnpike. Since the same trip necessarily consumes gasoline on which the traveler pays a specific tax per gallon, the Authority urges there is equal propriety and legality in applying a legislatively stated portion of that motor fuel tax for possible permissive use to pay for the Turnpike.

Section 3 of the 1959 Act, 69 O.S.Supp. § 682, provides the detailed method for determining the amount of motor fuel tax collected on motor fuel consumed on Turnpike Projects. This seems fairly adequate to accomplish the desired result and need not be fully set out here.

Section 4 of the 1959 Act, 69 O.S.Supp. 1959 § 683, provides in subdivisions (a) and (b) as follows:

"(a) The Oklahoma Turnpike Authority shall segregate and hold such motor fuel excise taxes apportioned to it by this Act in trust for the uses and purposes herein provided.

"(b) The deposits in this Trust Fund, as the same accumulate, may be expended or pledged by the Oklahoma Turnpike Authority, as it may deem proper, either in whole or in part, for making up any deficiency in the mon-

eys available to meet interest requirement on Turnpike Bonds hereafter issued and for the payment of necessary expenses in the financing of additional Turnpikes, provided, that such expenses of financing shall not exceed on the Southwest Turnpike the sum of Twenty-five Thousand Dollars ($25,000.00) or on the Eastern Turnpike the sum of Fifty Thousand Dollars ($50,000.00), not more than ten per cent (10%) of which sums shall be used as attorneys' fees, and provided, that any funds expended as permitted herein shall, upon payment of all interest and principal of all bonds issued hereunder, and before delivery of any Turnpike to the State of Oklahoma Department of Highways, be replaced in said trust fund by said authority, and upon the completion of said reimbursement, said trust shall terminate and the balance in said trust fund shall be delivered to the State of Oklahoma Department of Highways."

The protestant at first, and in his brief, misconstrues the effect of section one as to this apportionment of this portion of motor fuel tax. He thought the section provided for a permanent pledging of these motor fuel taxes for the future years to pay for the turnpikes of the State. He thought this plan extended beyond the present biennium, and undertook to bind the future Legislatures to maintain the same motor fuel tax, and that the section undertook to require the expenditure of the stated portion of such tax through all future years to pay interest and principal of turnpike bonds.

Based upon this erroneous construction of the 1959 Act the protestant contended that a debt was created against the State.

However, in reply brief Authority pointed out the above quoted provision of Section 4 of the Act as making it plain that neither the Act as a whole, nor Section 1, was subject to the construction placed thereon by protestant. Authority thus pointed out that "the deposits in this trust

fund as the same accumulate may be extended or pledged by the Oklahoma Turnpike Authority as it may deem proper, either in whole or in part, for making up any deficiency in the moneys available to meet any such requirements etc., * * *" Thus limiting such pledges or expenditures to funds actually accumulated by apportionment of motor fuel tax.

This makes applicable the ruling in Application of Oklahoma Ed. Television Authority, Okl., 272 P.2d 1027, that the legislative use or application of funds on hand does not amount to any creation of a debt against the State.

Furthermore, if any money is spent by Authority out of the trust fund created with or from motor fuel taxes, it will only be a temporary use or expenditure since provision is made for its repayment into the fund by Authority.

Turnpikes are public highways. Application of Oklahoma Turnpike Authority, 203 Okl. 335, 221 P.2d 795. The above use of the stated portion of motor fuel tax funds is a use for a public purpose, and in fact is a public highway use.

Upon public hearing and oral argument the protestant now admits that upon a more studied construction of the Act, this provision for the specific use of the stated portion of motor fuel tax does not amount to the creation of any debt against the State, or constitute any illegal use of such tax money. Nevertheless, it is this court's duty to consider and to determine such questions.

We deem further discussion unnecessary. It is plain from the provisions of the Act, and from what we have said above, that this apportionment of part of the tax from motor fuel consumed on the several turnpikes into a segregated trust fund and the possible permissive use of such fund, and the possible making of expenditures therefrom does not constitute any illegal use of such tax money, nor does such provision create any debt against the State of Oklahoma. This conclusion seems to us to be in complete harmony with this court's decisions in the several Turnpike cases heretofore decided and cited in an earlier paragraph of this opinion.

We answer this first question in the affirmative.

■ Second Question:

"May the Oklahoma Turnpike Authority expend or pledge the deposits made to said Trust Fund, as the same accumulate, for the purpose of making up any deficiencies in the moneys available to meet interest requirements on Turnpike Bonds hereafter issued and for the payment of necessary expenses in financing additional Turnpikes limited by the provisions of said Act?"

Here again there is no pledging of motor fuel tax money for any period of time into the future, that is, for taxes collected during any future period. Here again the permissible use or expenditure of money out of this trust fund is for a public purpose, and on and in connection with public highways, and if the spending of this money is so used it would be legitimate and legal. This contingent permission to use money on hand in this fund of course cannot create any debt against the State. The provision does not create any obligation on the part of the State to pay any sum of money to any one, at any time. When we consider the component parts necessary to create a debt we see at once that no debt is here created. Based upon what we have said here, and what we said in answer to the first question, we likewise answer the second question in the affirmative.

Third Question:

"May the Oklahoma Turnpike Authority invest the moneys deposited in said Trust Fund not presently needed in Federal Accounts Receivable of the Department of Highways of the State of Oklahoma or in securities of the United States of America as provided in said Act?"

■ Subdivisions (c) and (d) of Section 4 of the 1959 Act, 69 O.S.Supp. § 683, provide as follows:

"(c) Consistent with the provisions of Subsection (b) and so long as the same does not restrict the availability of such funds for the uses and purposes set forth in said Subsection (b), the Authority is authorized and directed to invest any funds in said Trust Fund in Federal Accounts receivable of the Department of Highways of the State of Oklahoma, by depositing not to exceed the amount of said Federal reimbursements in a Special Account in the State Highway Construction and Maintenance Fund in the State Treasury. Payments from such Special Account shall be made by the Department of Highways only for the payment of amounts which are to be reimbursed by the Federal Government. When such Federal reimbursement is actually received it shall be redeposited by the Department of Highways in such Special Account together with such additional State funds, if any, as may be necessary to make up any deficiency in the Federal reimbursement actually received. The Turnpike Authority is further authorized to withdraw from such Special Account at any time, any funds required to meet the commitments made under the terms of any Trust Agreement hereafter entered into for the purpose of financing a Turnpike Project or Projects."

"(d) The Oklahoma Turnpike Authority is hereby authorized to invest all or any part of such Trust Fund in securities of the United States of America."

The Federal Accounts Receivable mentioned in this portion of the 1959 Act come into existence in connection with numerous road and bridge construction projects handled by the State Highway Commission in cooperation with the proper agency of the Federal Government as Federal Aid programs. On those projects the Federal Government pays a percentage of the cost, but usually, if not always, only after the State Highway Commission has actually paid out the construction cost, and after specific agreement to participate has formerly been executed by the proper agency of the Federal Government. When that occurs on any given project then the Federal Agency is indebted to the State Highway Commission, and until collection is made the State Highway Commission sets up the amount due on and as a Federal Account Receivable in the agreed or calculated amount.

The investment of Turnpike Authority funds, on hand, but not presently needed for expenditure purposes, in these Federal Accounts Receivable, or the deposit of such Turnpike Authority funds in the Special Account in the State Highway Commission Construction and Maintenance Fund in the State Treasury for such Federal Accounts Receivable in a sum equal to the amount deposited, can well be of benefit to the general highway purposes of the State, while such deposit of the money is no burden to the Turnpike Authority since the Authority may withdraw such funds from said Special Account at any time such funds are required to meet the commitments or requirements of the Turnpike Authority.

Since such funds of the Authority must be deposited somewhere pending the need to make expenditure, we see no reason why the Authority should not be given this statutory permission to make this particular investment or deposit. We construe this legislation as giving to the Turnpike Authority complete discretion in determining what portion of funds on hand could be considered as free from any present need for expenditure purposes, and therefore it seems to be left entirely to the discretion of the Turnpike Authority as to when or how much money it will invest or deposit in this particular Special Account for Federal Accounts Receivable.

As to subdivision (d) above quoted we think it is the universal practice to authorize various public agencies as well as others to make investments in securities of the United States of America. This means of course in their discretion as to when and how much money may be so invested

so as not to restrict the availability of such funds when they are needed by the Authority for proper expenditure purposes.

We answer question number three in the affirmative.

■ Fourth Question:

"May the Oklahoma Turnpike Authority construct and finance that part in Oklahoma of a Turnpike between a connection with the Turner Turnpike near the Oklahoma City Terminus and Wichita Falls, Texas, or any part of such Turnpike; and for that purpose enter into an agreement with the Oklahoma Department of Highways for the construction by the Department of Highways of a four-lane, divided, toll-free bridge on a United States or State Highway across the South Canadian River south or west of Will Rogers Airport and west of the north-south line of May Avenue, with ¼th of the cost of said bridge and the approaches thereto to be paid by the Oklahoma Turnpike Authority and the remaining ¾ to be paid from State and Federal-Aid Funds?"

· A very similar question was presented and decided in Application of Oklahoma Turnpike Authority, Okl., 277 P.2d 176, where we answered the ninth question there presented in the affirmative.

In that case we held that the Turnpike Authority had authority to finance and construct this particular Turnpike and that Authority could join with the State of Texas and construct a toll-free bridge across Red River, each State paying one-half of the cost of constructing and maintaining said bridge. No more difficult question is presented by the inquiry here as to whether the Turnpike Authority could join with the State Highway Commission and the Federal Government in constructing a toll-free bridge across the South Canadian River at the point in Oklahoma where the continuation of the Turnpike would run into or cross such river; one-fourth of the bridge cost to be paid by the Authority, and the remaining three-fourths

to be paid from State and Federal Aid funds.

Since this matter is thoroughly discussed in the above referred to case, 277 P.2d at pages 192, 193 and 194, we need not repeat it nor discuss it further here. We approve that language of the former decision, and answer this fourth question in the affirmative.

■ Fifth Question:

"May the Oklahoma Turnpike Authority construct and finance a Turnpike, or any part or parts thereof, beginning at the Oklahoma-Texas State Boundary line, and extending North on a route lying East of the Cities and Towns of Wilson, Maysville, Norman and Oklahoma City, and West of the Eastern State Line of Oklahoma to a connection or connections between the Turner Turnpike and the south side of the Arkansas River in accordance with the terms of said Act?"

This 1959 Act expressly empowers the Authority to construct this Turnpike, referred to for convenience as the "Eastern Turnpike."

This court has heretofore approved similar legislation authorizing the construction of the "Turner Turnpike" 221 P.2d 795, and similar legislation authorizing the construction of the "Will Rogers Turnpike" and the "Southwestern Turnpike" 277 P.2d 176. The statements made in those two decisions furnish a complete answer to this question as to the general authority of the Turnpike Authority to construct this turnpike, provided of course, that the same is financed and constructed in accordance with the terms of this 1959 Act.

We therefore answer this fifth question in the affirmative.

■ Sixth Question:

"May the agreement or agreements for financing the two Turnpikes above referred to properly contain a provision that tolls shall continue to be charged on all Turnpikes until the bonds and the interest thereon, of all Turnpikes have been fully paid?"

Section seven of the 1959 Act, 69 O.S. Supp. § 655, subdivision (e) provides in paragraph numbered (2) for the construction of the "Southwestern Turnpike" and the bridge across South Canadian River, and in paragraph numbered (4) for the construction of the "Eastern Turnpike." The next paragraph of the Act provides as follows:

"The Agreement or Agreements for financing the Turnpikes authorized by Paragraphs (2) and (4) of this Section may contain a provision that tolls shall continue to be charged on all Turnpikes until the bonds, and the interest thereon, of all Turnpikes have been fully paid off, and provision that the revenues from any of the Turnpikes in excess of its operating and maintenance costs and sinking fund and other reserve requirements shall be used to pay the obligations of the other Turnpikes."

This combining of sources of revenue to pay for Turnpikes has much to commend itself in reason and in principle. All Turnpikes, as we have noticed, are public highways. By this provision the revenue from all Turnpikes will be or may be applied to pay for all Turnpikes which seems in principle to be quite sound and better for many reasons than merely to have each Turnpike to stand alone on its own base. Furthermore, this principle as applied to Turnpikes is quite similar to the combining of State Park facilities revenue to pay for all park facilities improvements. Application of Oklahoma planning and Resources Board case, Okl., 274 P.2d 61.

In that case, similar to the situation here, we had a very valuable state park facility already a sound going concern, standing alone on its own base, that is, relying upon its own state park facilities income to retire its bonds, and thus to pay for constructing the facility. Then the Legislature provided for the issuance of bonds for the construction of various facilities in numerous other state parks, with the provision that income from all State Parks would be applied into the bond retirement fund until bonds for building of all such state park facilities were paid or fully financed. That authority would be sufficient to justify and require that we approve this provision of the 1959 Turnpike Act.

When tolls collected for travel on a Turnpike are used for construction and maintenance of that same Turnpike such funds are exclusively used for public highway purposes. When such tolls are so used for the benefit of other Turnpikes there is similar exclusive use for public highway purposes.

This plan will benefit the State by hastening the time when all Turnpikes may be finally turned over to the State Highway Department and will extend the time of maintenance of Turnpikes from tolls without payment thereof by Highway Commission out of general highway funds. This will leave more of the general highway funds for use on other public highways while the Turnpikes will continue to be well maintained.

█ It is a matter of common knowledge that the first Turnpike, like the first substantial State Park facility, is prosperous and will quite likely pay out on its own separate bonds sooner than some other one or more of the Turnpikes or State Park facilities. It would seem that the similar plan, adjudged to be legal in reference to all Park facilities, available to all upon payment of the required charges, should also be found to be legal as applied to our Turnpikes likewise available to all.

We answer this sixth question in the affirmative.

█ Seventh Question:

"May the Act referred to properly cancel a contract previously entered into relating to Turnpikes not now financed or under construction?"

On this point Sec. 2 of the 1959 Act, 69 O.S.Supp.1959 § 681, provides as follows:

"It is hereby declared to be the intent of the legislature, and the Oklahoma Turnpike Authority is therefore directed to hold payments for engineering

and legal services to the barest minimum, and it is further the intent of the Legislature that in regard to bonds hereafter issued, so far as possible, the service of the Chief Engineer of the Turnpike Authority be utilized as the Consulting Engineer and the service of the Attorney General be utilized as legal counsel for the Authority; that any contract, express or implied, heretofore entered into relating to turnpikes not now financed or under construction shall be a nullity, as far as bonds sold under this Act are concerned; and the Oklahoma Turnpike Authority is hereby directed to file with the presiding officer of each House of the Legislature at its next session a full and complete public report on all such fees paid or contracted to be paid, stating the reasons why the same were necessary and could not be reduced."

As a general economy measure or declaration for frugality and prudence this provision is wholesome. The express directions to Authority must be followed and in general the intent of the Legislature is well stated.

However, we cannot approve the stated "intent of the Legislature * * * that any contract, express or implied, heretofore entered into relating to turnpikes not now financed or under construction shall be a nullity, as far as bonds sold under this Act are concerned."

This (7th) is a rather difficult question to consider or to comprehensively answer. We have no official information as to how far the efforts to finance or the commencement of construction of other turnpikes has progressed, so that we have no right to say in this connection which turnpikes are "not now financed or under construction." Furthermore, we have no contracts before us and we could have no thought as to how many contracts or which contracts the Legislature had in mind. If there are any such contracts, we do not have the contracting parties before us and could therefore make no binding declaration affecting them. Of course if there are such former contracts

which are invalid for any reason, then they would remain invalid without recourse or reference to this legislative Act. On the other hand, if the Authority had the power to enter into former contracts and did so, and if said contracts were fully valid when entered into, and if they continued as subsisting valid contracts up to the passage of this 1959 Act, then it is obvious that our Constitution would prohibit the Legislature from impairing the validity of such contracts merely by the quoted declaration in this 1959 Act. Const. Art. 2, Sec. 15. Even the approval of this legislation by the Court could not effectively vacate or invalidate any such former valid contracts.

However, in view of this definite statement of the "intent of the Legislature" the parties to any pre-existing contract, if any there be, should carefully check their contracts as to validity before proceeding thereon or undertaking any legal enforcement thereof, and if any such contracts should come before the courts for consideration, they should be carefully checked there for validity. We are really satisfied that nothing more than this could have been intended by the Legislature, in view of the well known constitutional prohibition against the authority of the Legislature to pass a law that would cancel an existing valid contract.

In effect this provision is directory to the Turnpike Authority directing it to assert the invalidity of any invalid or ineffective contracts, and directing the Authority, if the contracts are invalid or ineffective, to utilize the services of the Attorney General, and to use the Chief Engineer of Authority as their consulting engineer when and where not in conflict with any existing valid contracts.

Therefore, in general, the answer to this seventh question is that this Act, by the language here involved, is not effective to properly cancel any existing valid contracts for the reasons above stated.

■ Eighth Question:
"May an insurance company invest not to exceed 10 per cent of its assets

in Turnpike Revenue Bonds of any one Turnpike?"

The original Turnpike Act adopted in 1947, 69 O.S.1951, § 651 et seq., provided that all insurance associations, and insurance companies, as well as banks, trust companies, trust and loan associations, and investment companies could legally and properly invest funds in Turnpike Revenue Bonds, and it is understood as a historical fact that many such named entities, including insurance companies, did purchase turnpike bonds.

Thereafter, in 1957, when the Legislature adopted the Oklahoma Insurance Code, the long and comprehensive Act, S.L.1957, pp. 215 to 408, 36 O.S.Supp.1957 §§ 101 to 5301, provided in Secs. 1606 to 1626 that insurance companies could invest only in securities described in that Act. That Act omitted or did not refer to turnpike bonds, however, there is not evident any reason why that Legislature should have desired or intended to prevent such investment; or to change the existing law in that respect. At any rate, this 1959 Act provides in Section 8 thereof as follows:

"Section 1606, paragraph A. House Bill No. 501, 1957 Session Laws, page 286, (Title 36, O.S.1957, Supplement, § 1606, paragraph (A) is hereby amended to read as follows:

"Section 1606. A. Every insurer shall invest and maintain invested funds to the amount of the minimum paid-in capital required under this code of a like domestic stock insurer transacting like kinds of insurance, only in cash and the securities described in the following sections of this Article: Section 1607 (Securities of or guaranteed by the United States); Section 1608 (Securities of states, counties, municipalities, school districts); and Section 1622 (Mortgage loans on real estate); and in bonds of the Oklahoma Turnpike Authority. Provided such investment in the bonds of any one Turnpike shall not at any one time aggregate an

amount exceeding ten per cent (10%) of the insurer's assets."

The clear purpose of this Act is to authorize insurance companies to invest in Turnpike Bonds up to the percentage extent stated. Insurance Companies are not compelled so to do, but they may do so in their discretion. No objection is made to this permissive authority being granted to insurance companies, and it seems to us that there logically could not be any such question.

It has long been a legislative policy to put some limitation on investments by insurance companies. This result has been attained by listing certain bonds of determined stability and soundness as bonds worthy of being placed in such list. No reason is presented why Turnpike Bonds should not have a place along with securities of states, counties, municipalities and school districts for permissive insurance company investments.

We answer the eighth question in the affirmative.

█ Ninth and Last Question:

"May the Legislature properly designate the Oklahoma Turnpike Authority an instrumentality of the State and make the exercise of its powers in the construction, operation and maintenance of Turnpike Projects an essential governmental function of the State with all of the attributes thereof?"

On this point section six of the 1959 Act amended 69 O.S.1951 § 653 as amended, and completely restated that entire section as here amended. Subdivision (a) of section 6 of the 1959 Act takes the place of the first paragraph of 69 O.S.1951 § 653, and reads as follows:

"(a) There is hereby created a body corporate and politic to be known as the 'Oklahoma Turnpike Authority', and by that name the Authority may sue and be sued, and plead and be impleaded. The Authority is hereby constituted an instrumentality of the State, and the exercise by the Authority of the powers conferred by this Act in the

construction, operation, and maintenance of turnpike projects shall be deemed and held to be an essential governmental function of the State with all the attributes thereof. Provided, however, the Turnpike Authority is authorized to carry and shall carry liability insurance to the same extent and in the same manner as the State Highway Commission, and in addition thereto it shall be subject to the Workman's Compensation Laws of the State the same as a private construction project."

The protestant does not make any attack on this provision. No objection has been made to it whatever, and we do not see how or why any objection could be made to it. This exact question was stated in both application and brief filed August 29, 1959, herein and although due public notice was given of the application and of the allowed protest period and of the date of hearing, no protest of the provision has been made.

Surely it is within the discretion of the Legislature to provide that the Authority may sue and be sued; that it is constituted an instrumentality of the state; that the exercise of its powers shall be deemed and held to be an essential governmental function of the state; that it is required to carry liability insurance the same as the State Highway Commission, and that Authority shall be subject to the Workman's Compensation Laws of the State.

Generally, this provision rather closely analogizes Turnpikes, their construction and operation, to the construction and operation of other public highways constructed and maintained by the State Highway Commission. Both types of roads are public highways, though they are constructed by different and separate state instrumentalities, and are so separately maintained until the Turnpike is finally freed of all bond obligations and is taken over by the State Highway Commission.

There appears much reason why close similarity should generally prevail between the two as regards the details and items included in subdivision (a) here involved.

Persons dealing with the Authority should have as much protection of all rights as if they so dealt with Highway Commission. Persons traveling over either type of highway should have equal rights and protection, except of course each traveler on the Turnpike must pay the toll and comply with the rules for entering and leaving and driving on the Turnpike, which in some details differ from similar use of some other public highway. We see no reason why such persons should have more or less of protection of rights as to either instance of travel. Generally, of course, there is similarity in the risk of highway travel, or the chance the motorist takes, on whatever type of public highway he travels. However, that risk should be substantially less on the Turnpikes where gradecrossings are eliminated, and there are other features of Turnpike travel which make for increased safety.

Liability insurance is carried by the State Highway Commission. Why not let the Legislature require Authority to do the same? We see no reason why not. And if the Legislature sees fit to extend the wholesome benefits of the Workmen's Compensation Laws to the employees of Authority, the same as to other workers engaged in employment classified as hazardous, we see nothing therein but rational legislation with no illegality or unvalidity. We here note that the Legislature applies this law to workers engaged in a great many stated employments. There is no expressed limitation on this power to legislatively classify and list those employments deemed to be hazardous. The effect of this provision is to so classify employment on Turnpikes.

Here, as in other questions, there is no protest or objection, but we took it as our duty under the Act to consider the entire Act and to answer each specific question presented.

We answer this ninth question in the affirmative.

Pursuant to the authority and duty of the Court in this matter the validity and

constitutionality of this Act is in general approved, except as to question number seven. The answer heretofore stated to all nine questions are so adjudicated.

This we deem to be a complete discharge of the Court's duty under the Act and pursuant to a consideration of the Application and Protest. If either party has further question, or if we have not clearly spoken on a question, either party may so state in petition for rehearing.

The Court hereby fixes a period of ten (10) days in which a petition for rehearing may be filed herein.

DAVISON, C. J., and HALLEY, JOHNSON and JACKSON, JJ., concur.

BERRY, J., concurs in part and dissents in part.

WILLIAMS, V. C. J., and BLACKBIRD and IRWIN, JJ., dissent.

IRWIN, Justice (dissenting).

Without attempting an analysis of all similarities and dissimilarities between Engrossed House Bill No. 932 and previously enacted turnpike legislation, in my opinion, certain basic and fundamental dissimilarities stand out as decisive. All previous enactments relating to the issuance of turnpike revenue bonds have provided that such bonds would be paid solely from the revenues derived from the operation of the turnpike for which the bonds were issued. This is the first instance where there has been presented to this Court for approval a Legislative enactment relating to toll road projects wherein, (1) Revenues derived from the taxing powers of the State have been apportioned to finance toll road projects, (2) Tolls may continue to be charged on all turnpike projects until all the principal and interest on all turnpike revenue bonds have been paid, (3) Revenues received from the operation of existing turnpike projects may be used for paying obligations of turnpike projects to be constructed and revenues from the operation of turnpikes hereafter constructed

and revenues received from the taxing powers of the state may be used to pay the obligations on existing turnpikes. By virtue of these basic and fundamental dissimilarities, certain provisions of Engrossed House Bill No. 932 must be considered in view of the Constitution of the State of Oklahoma.

In construing our Constitution and giving effect to the intent of its framers and the people adopting it, and presuming that words have been employed in their natural and ordinary meaning, I am of the opinion certain provisions of Engrossed House Bill No. 932 are unconstitutional in the following respects: (1) The Act is contrary to and violates Section 19, Article X of the Oklahoma Constitution for the reason it apportions a motor fuel tax derived by the taxing powers of our State for a purpose for which it was not levied. (2) The Act is contrary to and violates Section 23, Article X of the Constitution for the reason a debt or obligation is created against the State. (3) The Act is contrary to and violates Section 15, Article X, and Section 15, Article II, of our Constitution for the reason it makes a donation to the bondholders of previously issued bonds and impairs existing contracts.

For clarity, these reasons and another provision of the Act will be considered as Propositions I, II, III, and IV.

Proposition—I

In my opinion, the Act is contrary to and violates Section 19, Article X, of the Oklahoma Constitution for the reason it apportions a motor fuel tax derived from the taxing powers of our State for a purpose for which it was not levied. The motor fuel tax apportioned by this Act was levied for the purpose of construction, repair and maintenance of State Highways and this Act apportions the tax to pay interest and principal on Turnpike Revenue Bonds.

Section 19, Article X, of the Constitution provides:

"*Every act* enacted by the Legislature, and every ordinance and resolution passed by any county, city, town,

or municipal board or local legislative body, *levying a tax shall specify distinctly the purpose for which said tax is levied, and no tax levied and collected for one purpose shall ever be devoted to another purpose.*"

The Act under consideration, inter alia, provides:

§ 1. (a) *"Beginning with* the first apportionment of motor fuel taxes made after the passage and approval of this Act, *and until all turnpike revenue bonds hereafter issued by the Oklahoma Turnpike Authority and the interest thereon shall have been paid* * * * the Oklahoma Tax Commission shall each month * * * apportion a sum equal to said amount from all gasoline tax collections as follows: Ninety-seven per cent (97%) of such amount to the Oklahoma Turnpike Authority * * *."

* * * * * *

§ 4. (a) "The Oklahoma Turnpike Authority shall segregate and hold such motor fuel excise taxes apportioned to it by this Act in trust for the uses and purposes herein provided."

(b) "The deposits in this Trust Fund, as the same accumulate, may be expended or pledged by the Oklahoma Turnpike Authority, * * * for making up any deficiency in the moneys available to meet interest requirements on Turnpike Bonds hereafter issued and for the payment of necessary expenses in the financing of additional Turnpikes * * *".

It is to be noted that this Act does not levy a tax or amends any revenue tax law, but merely apportions to the Oklahoma Turnpike Authority a part of the tax levied by House Bill No. 415 of the 1939 Legislature, now Title 68 O.S.1951 § 659a, which specifies the purpose for which said tax was levied pursuant to Sec. 19, supra, of the Constitution. Section 3, of the 1939 enactment, now 68 O.S.1951 § 659b, provides that revenue from said tax shall be used for the following purposes:

"* * * (b) Seventy per cent (70%) shall be deposited in the State Depository to the credit of the State Highway Construction and Maintenance Fund and expended for the construction, repair and maintenance of State Highways."

The fact that the revenue apportioned by the Act is derived from the tax from motor fuel supposedly consumed upon the turnpikes would seem immaterial. In my opinion, this is merely a method for determining the amount to be apportioned monthly. The excise tax as levied in 1939 was upon the sale of each and every gallon of gasoline sold, or stored and distributed and was not upon the use of the motor fuel.

We have previously construed Section 19, supra, of our Constitution relating to the requirement of distinctly specifying the purposes for which a tax is levied and legslative acts attempting to divert or donate said tax for other purposes. In State ex rel. Board of County Commissioners of Harmon County v. Oklahoma Tax Commission, 191 Okl. 155, 127 P.2d 1052, we held:

"Chapter 1e of Title 62, S.L.1941, p. 273, which directs the diversion of gasoline excise taxes levied and collected for the purpose of 'constructing and maintaining county or township highways and permanent bridges in each county' to the general revenue fund of the state, is violative of section 19, article 10 of the state constitution, and is void."

In Boswell v. State, 181 Okl. 435, 74 P.2d 940, 941, we held:

"Article 10, chapter 50, Session Laws 1937, Senate Bill No. 205, 69 Okl.St. Ann. § 99 et seq., authorizing the State Highway Commission to borrow money for the purpose of constructing roads and bridges and to issue and sell Highway Revenue Anticipation Notes in an aggregate amount not to exceed $35,-000,000, and irrevocably pledging 40 per cent. of the 3 cents per gallon ex-

cise tax on gasoline referred to in section 2, chapter 126, Session Laws 1933, 68 Okl.St.Ann. § 656, to the payment of the principal and interest of said notes as they become due, also conditionally pledging a portion of the motor vehicle registration and license taxes, contravenes the constitutional debt limit for the state as fixed by the provisions of sections 23, 24, 25, article 10, of the Constitution, *and is unconstitutional and invalid in so far as it authorizes the issuance of said notes and diverts the said taxes therein specified into a separate fund to pay the same.*"

See also Craig County Excise Board **v.** Texas-Empire Pipe Line Co., 195 Okl. 627, 159 P.2d 1003.

It would seem that since this act did not levy the tax in question or amend an existing revenue tax law, the determining factor would be whether the tax as levied by the 1939 Legislature has been devoted to another purpose. If it has, the provision of the Act apportioning the motor fuel tax to the Oklahoma Turnpike Authority is unconstitutional; if it has not, the provision making the apportionment is constitutional.

The Turnpike Authority contends that the tax as levied has not been devoted to another purpose and relies upon Application of Oklahoma Turnpike Authority, 203 Okl. 335, 221 P.2d 795, 807. This case determined the validity of the 1947 Turnpike Act and the provision relating to expenditures by the State Highway Commission is as follows:

"Section 4(c) * * * Any obligation or expense hereafter incurred by the State Highway Commission with the approval of the Authority for traffic surveys, borings, preparation of plans and specifications, and other engineering services in connection with the construction of a project shall be regarded as a part of the cost of such project and shall be reimbursed to the State out of the proceeds of turnpike revenue bonds hereinafter authorized."

In construing this provision the Court said:

"There is no requirement that the Highway Commission shall expend any particular amount, or any amount at all, in that regard. *In fact the Act does not specifically authorize any such expenditure at all, but merely makes provision for reimbursement if any such expenditure shall be so made.* It is as if the provision had authorized reimbursement of funds so expended in advance by any one.

"The question whether the Highway Commission should so expend any monies is not exactly a proper question for determination in this proceeding, but we discuss it in our desire to consider every contention made by protestants. Of course the Highway Commission has general authority over the State to incur such preliminary expense in reference to highway construction, and when they incur such expense, on any particular line or route, the expenditure is not rendered illegal if that route or line is thereafter taken over by the Turnpike Authority and a toll road constructed thereon. It is only sound business and fair that in such an instance the Turnpike Authority should make reimbursement. In a case of such preliminary work and expense by the Highway Commission, even though made in possible contemplation of toll road construction by the Authority, if the Authority should fail or decline the line or route for toll road, the line or route might well be utilized as and for a portion of the state system of free roads. *Thus it seems clear that any such preliminary work and expense that is generally done, or might be done by the Highway Commission would be in exact accord with its general duties and would be thoroughly covered by and included in the appropriation of money to the Highway Commission, or for general use by the Highway Commission within the scope of its duties as to the public highways of the state.*"

It would seem the Court said, in effect, that the preliminary services rendered by the Highway Commission were within the scope of its general duties and if the Turnpike Authority wanted to utilize the preliminary work it could do so by reimbursing the Highway Commission. If the Turnpike Authority did not want to utilize and pay for the services, the Highway Commission could use it as preliminary work in constructing a portion of the State system of free roads.

A distinguishing feature between the 1947 Act and the Act under consideration is that the 1947 Act did not make an appropriation of any funds, it merely authorized the State Highway Commission to perform certain duties with the approval of the Turnpike Authority and authorized a reimbursement for the expenses incurred. The duties to be performed were within the scope of the general duties of the State Highway Commission. In the case at bar there is a definite apportionment of revenue derived from the taxing powers of the State for a specific purpose which is not within the scope of the general duties of the Highway Commission. As a matter of fact, the State Highway Commission will have no control as to the use or disposition of the funds apportioned as the apportionment is made to the Turnpike Authority to secure the payment of principal and interest on turnpike revenue bonds for projects that are not even a part of the State Highway System. Although turnpikes are public highways, they are not a part of our State Highway System in so far as construction, maintenance and operation are concerned. By the express language of our turnpike acts, turnpikes will not become a part of the State Highway System until the bonds and interest thereon have been paid.

In this connection, it is interesting to note that House Bill No. 415, which levied the tax and specified the purposes for which it would be used was approved on April 18, 1939. The same Legislature enacted House Bill No. 1, 1939 Session Laws, page 273, relating to the Department of High-ways under the control of a Highway Commission, which became effective January 11, 1939. By enactment of House Bill No. 1, the State Highway Commission was vested with certain powers and duties, among them being the supervision of State and Federal Highways which are constructed, improved or maintained *and to let, or supervise the letting of, all contracts for construction or improvements of state highways or any contract for road or bridge construction or improvement.*

By enactment of House Bill No. 932, the Legislature directs that a portion of the tax levied in 1939 shall be expended to meet interest requirements on turnpike bonds and for payment of necessary expenses in the financing of additional turnpikes. In my opinion, there is a clear distinction between expenditures for construction, repair and maintenance of state highways by the State Highway Commission for which the tax was levied and collected, and expenditures by the Oklahoma Turnpike Authority for meeting interest payments and necessary expenses in financing additional toll roads. This diverts the revenues levied for the construction, repair and maintenance of free roads to pay obligations of the Turnpike Authority in financing public roads upon which the people of this State will have to pay a toll before they can travel upon them, either for personal or commercial purposes.

I am of the opinion that the provisions of Engrossed House Bill No. 932, apportioning the revenue from the Highway Construction and Maintenance Fund for which it was levied to the Turnpike Authority to pay obligations of the Turnpike Authority, is devoting a tax levied and collected for one purpose to another purpose and is therefore unconstitutional.

Proposition—II

In my opinion, the provision of Engrossed House Bill No. 932, directing the Oklahoma Tax Commission to apportion a share of the motor fuel taxes to Oklahoma Turnpike Authority until all the revenue bonds and interest thereon shall have been paid

and the provision that tolls shall continue to be charged on all Turnpikes until the bonds and the interest thereon of all Turnpikes have been fully paid, create a debt or obligation against the State and is contrary to Section 23, Article X, of the Oklahoma Constitution. As will be hereinafter set forth, I concur in the construction and limitations placed upon the apportionment provision by the majority of my associates, but the Legislative enactment without such construction and limitations would be unconstitutional.

Section 23, Article X, of our Constitution, inter alia, provides:

"The State shall never create or authorize the creation of any debt or obligation, or fund or pay any deficit, against the State, or any department, institution or agency thereof, regardless of its form or the source of money from which it is to be paid. * * *"

In considering these provisions, we will consider the apportioning provision first. In determining this issue we must be cognizant of the provision in Engrossed House Bill No. 932 apportioning a part of the motor fuel tax derived from the taxing powers of the State to the Oklahoma Turnpike Authority until all turnpike revenue bonds hereafter issued and interest thereon shall have been paid. This is the first Legislative enactment apportioning any revenue derived from the taxing powers of the State to the Turnpike Authority to pay interest and principal on turnpike revenue bonds. In all previous turnpike enactments and other similar enactments which have been approved by this Court, self-liquidating bonds were involved, that is, bonds were issued to provide funds for the construction of facilities which facilities would produce revenue from the operation thereof, and it was expressly provided that the bonds would be paid solely from revenues derived from such operation. In these instances we held the constitutional restrictions applied only to a debt, obligation or deficit for the payment of which resort might properly be had to the taxing power of the state and since the Legislative enactments

did not obligate or create a debt against the State, they were constitutional. See Baker v. Carter, 1933, 165 Okl. 116, 25 P.2d 747, A & M Dormitory Construction Bonds; Sheldon v. Grand River Dam Authority, 1938, 182 Okl. 24, 76 P.2d 355, construction bonds for dam, hydro-electric plant, etc.; State ex rel. Kerr v. Grand River Dam Authority, 1945, 195 Okl. 8, 154 P.2d 946, second or additional bond issue for Grand River Dam; Application of Board of Regents of University of Oklahoma, 1945, 195 Okl. 641, 161 P.2d 447, Dormitory Construction Bonds; Application of Board of Regents for Oklahoma Agricultural and Mechanical Colleges, 1946, 196 Okl. 622, 167 P.2d 883, Dormitory Construction Bonds; Application of Oklahoma Planning and Resources Board, 1949, 201 Okl. 178, 203 P.2d 415, Bonds to construct Park Facilities and Housing space to be rented; Application of Oklahoma Turnpike Authority, 1950, 203 Okl. 335, 221 P.2d 795, Bonds to Construct Toll Road. Application of Oklahoma Turnpike Authority for Approval of Bonds, 1952, 206 Okl. 617, 246 P.2d 327, and Application of Oklahoma Turnpike Authority for Approval of Bonds, Okl.1954, 277 P.2d 176.

In Application of Oklahoma Educational Television Authority, Okl., 272 P.2d 1027, 1031, this Court construed a Legislative enactment authorizing issuance of bonds payable out of revenue accruing to the Public Building Fund. This Court held the act unconstitutional and distinguished it from those cases involving self-liquidating bonds by stating:

"The money realized by each of those bond issues itself created the construction or facility which in turn produced the income and funds against which the debt was a standing obligation, and the debt could not be collected from any other source, nor paid with any other moneys."

and we held:

"The Educational Television Act, House Bill 1033, Session Laws 1953, p. 551, 70 Okl.St.Ann. §§ 2141–2165,

in so far as it authorizes the creation of a debt against the Public Building Fund of Oklahoma, or against the receipts and revenues to accrue to said fund, violates Section 23 of Art. 10 of the Constitution of Oklahoma as amended in 1941, and to that extent said Act is unconstitutional and invalid."

And in considering the creation of a debt against the Public Building Fund, we said:

"Why would this provision of the Constitution operate to protect from future debt the cigarette tax fund or *the gasoline tax fund* and not also operate to protect from future debt the Public Building Fund? Why would there be such intention? A dollar in one such fund is worth as much to the citizens of the state as a dollar in another fund. A dollar in one fund is as much the property of and is as much owned by the citizens of the State as a dollar in another fund."

It would seem this Court very clearly and concisely stated, without reservation or qualification, that an obligation or debt cannot be created against the funds of this State, whether they be permanent funds or funds derived from the taxing powers of the State. There is no distinction between the applicable constitutional restriction in the Television Authority case and the case under consideration, the only distinction being in the Legislative Acts. In the Television Authority Act the revenue accruing to the Public Building Fund was pledged to the Oklahoma Television Authority as security for the payment of bonds and interest thereon issued by it; in the Act under consideration the motor fuel tax is apportioned to the Turnpike Authority as security for payment of bonds and interest thereon issued by it, until all the bonds and interest thereon shall have been paid.

In Morris v. City of Oklahoma City, Okl.1956, 299 P.2d 131, 137, this Court cited with approval In re Application of Oklahoma Planning and Resources Board, supra, wherein the Court, in referring to the Constitutional restrictions, said, "They do not prohibit the incurring of indebtedness payable only out of a special fund, which indebtedness is not, and cannot, become a debt of the state payable out of taxes levied by the state." See also Boswell v. State, supra.

Since the Act directs that the motor fuel tax shall be apportioned until the bonds and interest thereon shall have been paid, it would seem that the determining factor would be whether or not the State would be obligated to continue the apportionment of the tax to the Turnpike.Authority for the purpose of insuring that the Trust Funds would accumulate to be "expended" or "pledged" as the same accumulate, instead of whether the Turnpike Authority could "expend" or "pledge" the funds as the same accumulate. If this apportionment is only for the biennium and the State is not obligated to continue such apportionment, it would be constitutional for the Authority to "expend" or "pledge" these funds *after* the actual cash derived from the taxes involved has accumulated, that is, if the State can legally use revenues derived from its taxing powers for aiding in the construction of a public road and charge a toll for use thereof. If on the other hand, the State is obligated to continue this apportionment, without question, this part of House Bill No. 932 is unconstitutional.

In this connection, the Turnpike Authority contends and the majority opinion holds that the apportionment provision of the Act is not a permanent pledging of the motor fuel taxes as such apportionment does not extend beyond the present biennium and does not bind future Legislatures to continue the same apportionment. By virtue of this holding, there inheres in the majority opinion a holding that, (a) the provision apportioning the motor fuel tax to the Oklahoma Turnpike Authority until all bonds and interest shall have been paid is not an accrued or vested right of the bondholders, (b) the provision apportioning the tax does not enter into and become a part of the bondholders contract in such a way that any future Legislature would

have to enact legislation continuing the apportionment, and (c) the bondholders would have no remedy if a future Legislature did not enact legislation continuing the apportionment without making adequate provisions to replace said revenue in the Trust Fund.

I concur in the inherent and specific holdings of the majority opinion in that it is not a permanent pledging of funds as such apportionment does not extend beyond the present biennium and does not bind future Legislatures to enact legislation continuing the apportionment of the motor fuel tax. Otherwise, a debt or obligation would be created against the State contrary to Section 23, Article X of the Constitution and would be contrary to the following provisions of the same section which provides:

> "Within twenty days after the adoption of this amendment and thereafter prior to the convening of each regular session of the Legislature, *the State Board of Equalization shall make an itemized estimate of the revenues to be received* by the State under the laws in effect at the time such estimate is made for each year of the next biennium showing separately the revenues to accrue to the credit of the General Revenue Fund and each special fund of the State. * * * *The Legislature shall not pass or enact any bill, act or measure making an appropriation of money for any purpose until such estimate is made and filed,* unless the State Board of Equalization has failed to file said estimate at the time of convening of said Legislature, then, in such event, it shall be the duty of the Legislature to make such estimate pursuant to the provisions of this amendment, and all appropriations made in excess of such estimate shall be null and void."

Without these constitutional limitations and the majority opinion holding that it is not a permanent pledge of revenue as such apportionment does not extend beyond the present biennium and any future Legisla-

ture is not bound to enact legislation continuing the apportionment, I am of the opinion a different situation would exist as to the rights of the bondholders if they purchased bonds solely under the terms and conditions of the Legislative enactment.

If the bonds were purchased solely under the provisions of the Legislative enactment, without the Constitutional restrictions and the construction placed thereon by this Court, they would have been accepted by the bondholders in view of the provision of the Act making an apportionment of revenue derived from the taxing powers of the State to the Turnpike Authority until all the bonds and interest thereon shall have been paid. The bonds would have been accepted by the bondholders in view of the provisions of the Act under which they were issued as the law under which bonds of this character are issued, and under which contracts of this character are made, enters into and becomes an essential part of the contract. By earmarking certain revenues until all bonds and interest thereon shall have been paid, the Legislature created and conferred additional consideration as an incentive and inducement to the bondholders which became a part of their contract. See Nelson v. Pitts, 126 Okl. 191, 259 P. 533, 53 A.L.R. 1137; Oklahoma Cotton Growers Ass'n v. Salyer, 114 Okl. 77, 243 P. 232.

It follows that if bonds were issued solely under the provisions of this Act, without the Constitutional restrictions and construction placed thereon by this Court, the State would be obligated to continue the apportionment or make adequate provisions for the replacement of the revenues lost by the bondholders, or valuable rights of the bondholders would be extinguished and there would be an impairment of an existing contract in violation of the United States Constitution and our State Constitution.

Section 10, Article 1, of the United States Constitution provides that no State shall pass any law impairing the obligations of contracts. Section 15, Article 2, of the Oklahoma Constitution provides that "No

* * * law impairing the obligation of contracts, shall ever be passed." Section 54, Art. V, of the Oklahoma Constitution provides that "the repeal of a statute shall not * * * affect any accrued right * * * incurred * * * by virtue of such repealed statute." These inhibitions are applicable to contracts of the State as fully as to those between individuals. Fletcher v. Peck, 6 Cranch 87, 136, 3 L.Ed. 162; Poindexter v. Greenhow, 114 U.S. 270, 330, 5 S.Ct. 903, 962, 29 L.Ed. 185, 207; Wood v. Lovett, 313 U.S. 362, 61 S.Ct. 983, 85 L.Ed. 1404.

By virtue of the Constitution, if the rights of the bondholders had become vested or accrued under their contract and under the Legislative enactment, without the constitutional restrictions and the construction and limitations placed upon said Act by this Court, the State would have been obligated to continue the apportionment and would have no power to alter or repeal such Legislative enactment to the detriment of the bondholders. In Fortinberry Co. v. Blundell, 206 Okl. 261, 242 P.2d 427, 429, we held:

"Where one enters into a lawful and valid contract with the State, through a duly authorized State official, under an existing law which provides for and appropriates certain moneys to be used for the payment of a claim against the State, arising under such contract, the inhibitions of the State and Federal Constitutions against any law which impairs the obligation of contracts will not permit the repeal of such law insofar as it provides a fund from which the valid claims arising while said law is in force may be paid, unless other adequate provisions are made for the satisfaction of such claims."

In Oklahoma City v. Vahlberg, 197 Okl. 613, 173 P.2d 736, 737, we held:

"The laws existing at the time of issuance of municipal bonds and the authority under which they are issued enter into and become a part of the contract in such way that the obligation of the contract cannot thereafter

be in any way impaired or its fulfillment hampered or obstructed by a change in the law. The purchaser of such bonds takes them with such laws entering into and becoming a part of his contract."

I am therefore of the opinion if the bonds are issued solely under the provisions of this Act, without the construction and limitation placed thereon by this Court, the provision of the Act providing for the apportionment of revenues until the principal and interest thereon shall have been paid would create a debt or obligation against the State and would be in contravention of Section 23, Article X of our Constitution.

We will now consider the provision of Engrossed House Bill No. 932 authorizing the Turnpike Authority to enter into agreements for financing turnpikes with the provision that tolls shall continue to be charged on all turnpikes until the bonds and interest thereon of all turnpikes have been fully paid.

In my opinion, the State cannot authorize the Turnpike Authority to obligate itself to continue to charge tolls on the "Turner Turnpike" and the "Will Rogers Turnpike" after the bonds and interest thereon have been paid and apply such revenue to the payment of other turnpike bonds. In this connection I am not considering whether the State can continue to charge tolls after a turnpike project is turned over to the Highway Commission as that is not presented, but whether the Turnpike Authority can continue to charge tolls and use the revenue for other turnpike obligations. The two turnpikes, the "Turner Turnpike" and the "Will Rogers Turnpike" were constructed under separate acts which were complete within themselves; that is, each act provides that all moneys received from each of the Turnpikes, whether as proceeds from the sale of bonds or as revenues, shall be deemed trust funds, and shall be held and applied as provided in each Turnpike Act, and each refunding issue shall be limited to the project in connection with which the bonds being refunded were issued and revenues pledged to pay any such refund-

ing issue shall be limited to the revenues derived from said separate project. Each Act, the 1947 Act authorizing the "Turner Turnpike" and the 1953 Act, authorizing the "Will Rogers Turnpike", specifically provides, *"when all bonds issued under the provisions of this Act in connection with any turnpike project and the interest thereon shall have been paid* or a sufficient amount for the payment of all such bonds and the interest thereon to the maturity thereof shall have been set aside in Trust for the benefit of the bondholders, such project, if then in good condition and repair to the satisfaction of the State Highway Commission, *shall become a part of the State Highway System and shall thereafter be maintained by the State Highway Commission free of tolls."* 69 O.S. 1951 § 667.

In my opinion, the State, in its sovereign capacity has a vested or accrued right in the "Turner Turnpike" and the "Will Rogers Turnpike" when the bonds and interest thereon shall have been paid as the Acts authorizing the construction of each of them specifically state *that they shall become a part of the State Highway System.* Having such a vested or accrued right, the pledging of the revenues derived from their operation when they are paid out, would be creating a debt or obligation against the State in violation of Section 23, Article X of our Constitution.

### Proposition—III

In my opinion, the Engrossed House Bill No. 932 contravenes Section 15, Article X, and Section 15, Article 2, of our Constitution for the reason it makes a donation to the bondholders of previously issued bonds and impairs existing contracts.

Section 15, Title X, of our Constitution provides:

"The credit of the State shall not be given, pledged, or loaned to any individual, company, corporation, or association, municipality, or political subdivision of the State; nor shall the State become an owner or stockholder in, nor make donation by gift, sub-scription to stock, by tax, or otherwise, to any company, association, or corporation."

Section 15, Article 2, of our Constitution provides:

"No bill of attainder, ex post facto law, nor any law impairing the obligations of contracts shall ever be passed. * * *"

House Bill No. 932 provides that the agreement for financing the two new projects may provide that the revenues from any of the Turnpikes in excess of its operating and maintenance costs and sinking fund and other reserve requirements shall be used to pay the obligations of the other Turnpikes. It also provides the Turnpike Authority is authorized, *"To issue turnpike revenue bonds of the Authority, payable solely from revenues, including the revenues accruing to the Trust Fund created by this Act, for the purpose of paying all or any part of the cost of any one or more turnpike projects."*

The Act provides that the deposits in the Trust Fund may be expended or pledged "for making up any deficiency in the moneys available to meet interest requirements on Turnpike Bonds hereafter issued." If revenues derived from the operation of turnpike projects hereafter constructed were applied to payment on existing turnpike bonds, and the Trust Fund were used to make up any deficiency on turnpike bonds hereafter issued, there would be an indirect use of the Trust Funds, derived from the taxing powers of the State, for the purpose of paying pre-existing obligations of the Turnpike Authority.

In my opinion, the language of the Act is clear and unambiguous, that is, revenue derived from the operation of a turnpike project to be constructed can be used to pay all or any part of the cost of the "Turner Turnpike" or the "Will Rogers Turnpike" and revenue from the "Turner Turnpike" or the "Will Rogers Turnpike" can be used to pay all or any part of any other turnpike project. In this connection this Court

is not concerned with what will happen but concerned solely with the validity or constitutionality authorizing the use of the revenues involved as provided in the Act. Surveys might indicate and records might disclose certain facts, but we can not take judicial notice that any turnpike project now in operation or any turnpike project to be constructed, will or will not produce sufficient revenue to meet all obligations as they become due.

In support of the constitutionality and validity of the Act authorizing the use of revenues from one project to pay all or any part of the bonded indebtedness of another project, the Turnpike Authority and the majority opinion rely upon the Application of Oklahoma Planning and Resources Board, 274 P.2d 61, which was approved by this Court. In the Planning and Resources case, bonds were issued for the purpose of park improvements and for refunding previously issued bonds, and the combined revenue of all the state parks was devoted to the payment of the bonds so issued. The original bonds were issued pursuant to Senate Bill No. 47, 1947 Session Laws, p. 605, and Secton 16 of Chapter 12a, which expressly provided for the issuance of refunding bonds refunding any obligations of the Board. Section 16 reads:

"The Board may issue bonds hereunder for the purpose of refunding any obligations of the Board theretofore issued, or may authorize and deliver a single issue of bonds hereunder in part for the purpose of refunding such obligations and in part for acquisition of additional properties or improvements. * * *".

The 1947 and 1953 Turnpikes Acts contained provisions for the issuance of turnpike revenue refunding bonds, but each refunding issue was limited "to the project in conection with which the bonds being refunded were issued and revenues pledged to pay any such refunding issue shall be limited to the revenue derived from said separate project." Each Act also specifically provided that all monies received by the Turnpike Authority, whether as proceeds from the sale of bonds or as revenues, shall be deemed to be trust funds, to be held and applied solely as provided in each turnpike act. The 1959 Act under consideration did not repeal the section relating to the issuance of refunding bonds but only contained provisions that the revenues from any of the turnpikes in excess of its operating and maintenance cost and sinking fund and other reserve requirements shall be used to pay the obligations of the other turnpikes. The applicable law and facts are clearly distinguishable from those in the Oklahoma Planning and Resources case.

In my opinion, the revenues received from the operation of the "Turner Turnpike" can not be applied to the payment of any bonds other than the "Turner Turnpike Bonds"; the revenue received from the operation of the "Will Rogers Turnpike" cannot be applied to the payment of any bonds other than the "Will Rogers Turnpike Bonds"; the revenues apportioned by this Act or received by operation of turnpike projects hereafter constructed cannot be applied to either the "Turner Turnpike Bonds" or the "Will Rogers Turnpike Bonds."

If revenue received from the "Turner Turnpike" were applied to payment of the "Will Rogers Turnpike Bonds", the "Will Rogers Turnpike" bondholders would be receiving a donation or gift to which they were not entitled to under the law or under their Trust agreement. If the "Turner Turnpike" or the "Will Rogers Turnpike" bondholders received any revenue from the Trust Fund created by the Act under consideration or from projects hereafter constructed, they would be receiving a donation or gift to which they were not entitled to under the law or under their trust agreement.

The only security the bondholders of previously issued bonds have is in the revenue derived solely from the operation of the turnpike project for which their bonds were issued. Any contribution, donation or gift in addition thereto would be contrary to Section 15, Article X of the Constitution.

In Carter v. Thomas, 172 Okl. 558, 46 P. 2d 460, the word "gift" as used in the above quoted article is defined as follows in the 4th paragraph of the syllabus:

"4. A 'gift' as used in section 15, article 10 of the Constitution of Oklahoma intends all appropriations for which there is no authority or enforceable claim on which rests alone some material equitable obligation which in the mind of a generous or even just individual dealing with his own money might induce him to recognize as worthy of his reward."

See also, Veterans of Foreign Wars of United States Department of Oklahoma v. Childers, 197 Okl. 331, 171 P.2d 618.

In my opinion, the provision authorizing the use of revenues derived from the operation of the "Turner Turnpike" or the "Will Rogers Turnpike" for the purpose of paying all or any of the obligations of the other projects impairs or obstructs the law and the Trust agreement under which the bonds were issued. The "Turner Turnpike" and the "Will Rogers Turnpike" bondholders have a vested or accrued right in all the monies received pursuant to the authority creating each project whether as proceeds from the bonds or as revenues to be held solely for the purpose of meeting the bond obligations. My views on the accrued or vested rights of bondholders are expressed in Proposition II, and will not be necessary to reiterate.

For the foregoing reasons, I believe that the provisions of the Engrossed House Bill No. 932 providing for the issuance of turnpike revenue bonds payable solely from revenues, including the revenues accruing to the Trust Fund, for the purpose of paying all or any part of the cost of any one or more turnpike projects, and the revenues from any of the turnpikes in excess of its operating and maintenance costs and sinking fund and other reserve requirements shall be used to pay the obligations of other turnpikes, are contrary to Section 15, Article X, and Section 15, Article II, of our Constitution, and are unconstitutional.

### Proposition—IV

The Turnpike Authority states in its application that, "In financing of turnpikes it is necessary to perform certain engineering services. * * * The Authority has, therefore, entered into certain contracts and preliminary engineering work on both the South Turnpike and the Southeast Turnpike. A great portion of this work has been performed. Some of it has been paid for out of funds appropriated for that purpose. The work must be completed."

The Authority does not want to insist that the present contracts be enforced, nor does it want to insist that the present contracts are invalid. The Authority requests a determination whether it is bound by the existing contracts or is it free to enter into new contracts without liability under the old contracts.

The Turnpike Authority did not cite under what authority it had entered into certain contracts and engineering work on both the Southwest Turnpike and the Southeast Turnpike or under what authority an appropriation was made for these purposes and did not state what contracts had been entered into, what preliminary engineering work had been done, or from what funds appropriations had been made for such purposes.

I concur in the opinion expressed by the majority of my associates as the proposition is presented. Section 15, Article II, of our Constitution prohibits the Legislature from enacting any law impairing the obligations of contracts. By virtue of this constitutional provision the Legislature can not invalidate an existing contract entered into or an appropriation made by the Turnpike Authority under authority of a legislative enactment which does not contravene the Constitution. By the same token, any contract or agreement entered into or appropriation made by the Turnpike Authority, not specifically authorized by the Legislature, is illegal and unenforceable.

### Conclusion

For the foregoing reasons, I am unable to concur in the opinion promulgated by a majority of my associates, and I therefore respectfully dissent.