Dear Chairman Riebel,
¶ 0 This office has received your request for an official Attorney General Opinion in which you ask, in effect, the following question:
 Is H.B. 2551 (2004 Okla. Sess. Laws ch. 424, § 1), enacted by the 2004 Legislature, which requires the Oklahoma Transportation Authority ("OTA") to transfer the one-and-one-half mile section of the north end of the Indian Nation Turnpike to the Oklahoma Department of Transportation ("ODOT"), and five million dollars to the ODOT Highway Construction and Maintenance Fund, enforceable against OTA?
 Background
¶ 1 The OTA,[1] an instrumentality of the State, operates the state system of turnpikes. 69 O.S. Supp. 2004, § 1701[69-1701]; see
69 O.S. 2001 Supp. 2004, §§ 1701-1735 [hereinafter "Act"]. The OTA is authorized to construct a statewide network of turnpikes (69 O.S. Supp. 2004, §§ 1701[69-1701], 1705(e)) financed by revenue bonds.Id. § 1705(f); see 69 O.S. 2001, §§ 1709-1713[69-1709-1713]. Section 1717 provides that when all bonds issued under the Act have been paid or provisions made for their payment, the OTA's projects shall become part of the state highway system as free roads. Section 1717.1 of the Act provides that no turnpike project shall be transferred from the OTA to the state highway system except in accordance with Section 1717, or "[p]ursuant to the approval of the transfer by the Legislature as expressed in a concurrent resolution." Id.
 The Questioned Legislation
¶ 2 The 2004 Oklahoma Legislature 2nd Regular Session enacted H.B. 2551 ("Bill"), uncodified, with an effective date of November 1, 2004. See 2004 Okla. Sess. Laws ch. 424, § 1. The Bill provides:
 In order to provide for economic development opportunities, the Oklahoma Transportation Authority is hereby directed to transfer to the Department of Transportation the one-and-one-half-mile section on the north end of the Indian Nation Turnpike. The Oklahoma Transportation Authority is also hereby directed to transfer the sum of Five Million Dollars ($5,000,000.00) from the Reserve Maintenance Fund to the State Highway Construction and Maintenance Fund of the Department of Transportation for the construction of necessary interchanges and maintenance of such roadway. The transfer shall be made on November 1, 2004.
Id.
¶ 3 Can the Legislature lawfully direct OTA to divest itself of a part of the state turnpike system when the revenues of the entire system are pledged to the payment of OTA bonds?
 Limitations Under Revenue Bond Documents
¶ 4 Since the inception of the turnpike system in 1950 with the building of the Turner Turnpike between Oklahoma City and Tulsa, financing of additional toll roads has been through issuance of OTA revenue bonds. 69 O.S. 2001, § 1709[69-1709](A). The OTA Trust Agreement, dated February 1, 1989 [hereinafter "1989 Trust Agreement"], together with a series of supplemental trust agreements [hereinafter "Trust Agreement"], executed pursuant to Sections 1712 and 1713 of the Act, presently authorizes and secures OTA's revenue bonds.[2] The Indian Nation Turnpike, with Henryetta at its north end and Hugo at its south end, was financed through supplemental indentures between 1963 and 1966.[3]
¶ 5 The original turnpike financing with subsequent refinancings are all secured by a pledge of (1) the tolls and other revenues from the operation of the entire Oklahoma turnpike system, (69 O.S. 2001, § 1711[69-1711]) and (2) motor fuel excise taxes apportioned to OTA under Section 1727(a) of Title 69. See 1989 Trust Agreement, Granting Clause at p. 38. Sections 1712 and 1713 of the Act and Article IX, Section 901 under the 1989 Trust Agreement provide that OTA revenues are to be held as trust funds for the benefit of bondholders. In Article VII, Section 703 under the 1989 Trust Agreement, OTA covenants to operate the turnpike system to generate revenues for payment of its obligations.
¶ 6 The OTA covenants under Article VII, Section 713(a) and (b), that it will not sell or otherwise dispose of or encumber the Oklahoma turnpike system or any part thereof, except (1) a part of the I-35 to I-40 turnpike (Ada to Davis section) may be transferred to ODOT under specified conditions, and (2) parts of OTA property not needed for turnpike system operation may be sold based on a certification to that effect by OTA's consulting engineers. The proceeds of any permitted sales shall be deposited in the OTA Construction Fund or the Reserve Maintenance Fund under the 1989 Trust Agreement. Id. § 713(A). Section 803 provides the 1989 Trust Agreement may be enforced by the bank designated therein as trustee for the benefit of bondholders, and Section 804 provides that OTA revenues will be used pro rata for the payment of all outstanding bonds. Thus, a system of cross-collateralization has been established whereby the revenues from operation of the entire OTA turnpike system are pledged to payment of all outstanding OTA bond issues and no collateral is released until all outstanding OTA debt is paid. This method of financing was approved in In re Oklahoma Turnpike Authority,348 P.2d 510, 519 (Okla. 1960).
¶ 7 While the revenues of OTA are pledged to bond payment and no mortgage or security interest is created in the turnpike property itself, the 1989 Trust Agreement plainly sets out the covenant that OTA will operate all its existing and future turnpike system to generate as much revenue as possible for payment of OTA's bond debt.
¶ 8 As further security for its bond issues OTA has established certain funds and accounts including a revenue fund, a bond sinking fund, a debt service reserve account and a reserve maintenance fund held by the bond trustee under Sections 506-516 of the 1989 Trust Agreement. In Section 510 restrictions are placed on the use of money in the Reserve Maintenance Fund to assure it is used only for extraordinary maintenance or repair purposes, or to avoid default in payment to bondholders.
¶ 9 Article XI of the 1989 Trust Agreement deals with amendments or supplements to the financing instruments. Under Article XI, Section 1101(a)-(e) allows OTA and the bond trustee to enter into supplemental agreements without bondholder consent under some circumstances, such as curing ambiguities or errors in the documents or to allow for issuance of additional bonds subject to specified conditions. But Section 1101(f) limits the ability of the issuer and the bond trustee to adopting amendments in those situations where such changes "would not materially adversely affect the security for the bonds." Id. If a change or amendment to the 1989 Trust Agreement or other bond documents is proposed which would adversely impact the security for the bonds, Section 1102 requires approval by holders of a majority in a principal amount of outstanding bonds. There is no assurance bondholders would approve such a reduction in their security.
¶ 10 It is in this context that the Bill must be analyzed. The OTA's pledges and covenants securing its bond issues were in existence more than fifteen years before the effective date of the Bill. Can the Legislature properly direct OTA to take action contrary to the 1989 Trust Agreement and other bond documents?
 Impairment Of Contracts
¶ 11 Oklahoma Constitution Article II, Section 15 and the United States Constitution, Article I, Section 10 forbid the enactment of laws impairing obligations of existing contracts. In re Okla.Tpk. Auth., 348 P.2d at 520; Wickham v. Grand River Dam Auth.,118 P.2d 640, 643-44 (Okla. 1941); Davis v. McCasland,75 P.2d 1118, 1119 (Okla. 1938). The 1960 In re Oklahoma TurnpikeAuthority case struck down as unconstitutional legislation which purported to nullify certain engineering contracts to facilitate issuance of turnpike bonds. 348 P.2d at 520. The rights of holders of governmental bonds are protected against impairment by subsequent legislation. Straughn v. Berry, 65 P.2d 1203, 1204
(Okla. 1937); Davis, 75 P.2d at 1119.
¶ 12 This principle appears to have been adopted by the Legislature. Title 69 O.S. 2001, § 1732[69-1732] provides:
 The Legislature, notwithstanding any agreement or contract entered into by the Authority, may repeal, alter, or amend the authorization for the construction, or description of the route or location of any turnpike or turnpikes, or portion or portions thereof, for which bonds have not been sold at the time of such legislative action.
Id. (emphasis added).
¶ 13 The Legislature has thus recognized it may not pass legislation amending or altering provisions of already-adopted bond resolutions or other contracts executed for the benefit of holders of outstanding bonds.
¶ 14 The effect of the subject Bill would be to remove a part of the existing turnpike system from OTA control, thereby reducing the ability of OTA to generate turnpike revenues pledged to bondholders. Further, transfer of a part of the Maintenance Reserve Fund from OTA to ODOT would remove part of the money under the Trust Agreement already pledged as bond security. The effect would plainly be to dilute and impair the obligations of OTA in the 1989 Trust Agreement for the protection of bondholders. Such legislation must fail in light of the State and federal prohibitions against impairment of contracts.
 Separation Of Powers
¶ 15 Your question also raises the issue of the Legislature's power to become involved in executive functions, that is, the administration of OTA's bond issues, in light of the separation of powers requirements set out in Article IV, Section 1 of the Oklahoma Constitution. "This separation of powers provision mandates that each department of the government shall be kept independent in the sense that the acts of each shall never be controlled by or subjected, directly or indirectly, to the coercive influences of either of the other departments." In reOkla. Dep't of Transp., 64 P.3d 546, 549 (Okla. 2002). While recognizing the three departments of government cannot realistically be divided into "water tight compartments," the court applied a four-part test to determine if a challenged arrangement constitutes a "usurpation by one department of the powers of another department," holding that a statute which set up a legislative bond oversight commission, essentially with power to hold up or veto issuance of bonds by an executive department, constituted a "significant interference with the executive branch" in the bond approval process. Id. at 550, 552 (quoting Schneider v. Bennett, 547 P.2d 786, 792 (Kan. 1976)).
¶ 16 We conclude the Bill, if implemented, would force OTA to transfer a part of the turnpike system (and part of its associated reserve fund) to ODOT and would thus impair the OTA's ability to generate revenues for bond payments. Such a directive amounts to a significant interference with the executive and administrative functions of OTA, violating the separation of powers provision of the Constitution.
 Conclusion
¶ 17 The 1989 Trust Agreement authorizing and securing OTA's outstanding revenue bonds obligates OTA to operate the state turnpike system as a unit and use all system revenues to pay debt service and secure the bonds. The 1989 Trust Agreement, with very limited exceptions, further obligates OTA to not sell or encumber any property comprising a part of the turnpike system. Violation of these provisions would constitute an event of default under the 1989 Trust Agreement, thereby enabling the trustee to maintain suit for the breach. Amendments to the 1989 Trust Agreement modifying bond security would require approval of a majority of bondholders, a difficult process, without guaranteed success.
¶ 18 Oklahoma Constitution Article II, Section 15 prohibits passage of legislation impairing obligation of contracts. Article IV, Section 1 requires separation of powers among the judicial, legislative and executive branches of government, prohibiting exercise of executive functions by the Legislature. House Bill 2551 of the 2004 Legislature violates each of these provisions by directing OTA to transfer turnpike system property in violation of the 1989 Trust Agreement securing OTA bonds, thereby diluting the security pledged to bondholders without their consent, and impairing the obligations of the contract entered into for bondholders' benefit.
¶ 19 It is, therefore, the official Opinion of the AttorneyGeneral that:
 House Bill 2551 (2004 Okla. Sess. Laws ch. 424, § 1) which requires the Oklahoma Transportation Authority to divest itself of a portion of an existing turnpike and certain money held in an associated maintenance reserve fund, is unconstitutional and unenforceable against the Oklahoma Transportation Authority. Okla. Const. art. II, § 15; In re Okla. Tpk. Auth.,
348 P.2d 510, 519 (Okla. 1960); In re Okla. Dep't of Transp., 64 P.3d 546, 549 (Okla. 2002). House Bill 2551 unlawfully impairs the obligations of an existing contract (see Okla. Tpk. Auth. Trust Agreement with Supps. (photocopy on file with the Okla. Attorney General's Office)), and further amounts to an unauthorized extension of legislative power over an executive agency, in violation of the requirement of separation of governmental powers. Okla. Const. art. II, § 15; Okla. Const. art. IV, § 1.
 W.A. DREW EDMONDSON Attorney General of Oklahoma
 LYNN C. ROGERS Assistant Attorney General
[1] The Oklahoma Transportation Authority is successor to the Oklahoma Turnpike Authority. 69 O.S. 2001, § 1703[69-1703](A), (G).
[2] See Okla. Tpk. Auth. Trust Agreement with Supps. (photocopy on file with the Okla. Attorney General's Office).
[3] See 69 O.S. Supp 2004, § 1705[69-1705](e); 1989 Trust Agreement at p. 5.